James F. LEMP, and Helena M. Duggan, et al., Appellants,

v.

George John KETO, et al., Co–Personal Representatives of the Estate of Mary Eileen S. Lemp, Appellees.

Nos. 93–PR–135, 93–PR–151, 94–PR–1282.

District of Columbia Court of Appeals.

Argued May 6, 1996.
Decided June 12, 1996.

Edward Greensfelder, Jr., for appellants Helena M. Duggan, John Lemp, Jr., and James F. Lemp in No. 93–PR–151.

Nicholas D. Ward, for appellant James F. Lemp in Nos. 93–PR–135 & 94–PR–1282.

Thomas B. Carr, with whom Barry J. Pollack was on the brief, for appellees.

Before FERREN, STEADMAN, and FARRELL, Associate Judges.

FERREN, Associate Judge:

This appeal consolidates two cases arising out of the administration of the estate of Mary Eileen Lemp. In the first case, John Lemp, Jr., Helena Lemp Duggan, and James F. Lemp, as specific legatees of the Lemp estate, contend the trial court erred in charging them with (1) $29,695.73 in preservation and maintenance expenses attributable to their specifically devised property, (2) $10,541.72 in interest for the use of the estate's residuary funds to pay for the preservation and maintenance expenses prior to distribution of that property, and (3) $9,429.00 in income taxes on the interest earned on the proceeds of the sale of two specifically devised cooperative apartments. In the second case, James F. Lemp, as a former co-personal representative of the Lemp estate, claims the trial court erred in failing to make adequate findings of fact justifying rejection of his request for compensation. In the first case, we reverse on the first two claims of error and affirm on the third. In the second case we affirm.

## I.

Mary Eileen Lemp died on October 1, 1981, leaving an estate valued at $1,128,673.11. To her stepchildren, Helena Lemp Duggan, James F. Lemp, and John Lemp, Jr. (the Lemps), Mary Lemp devised property with a total value of $208,000 that included real estate in Maryland, Pennsylvania, and Virginia, and two cooperative apartments in the District of Columbia. The rest of Mary Lemp's assets were left to her brother, W.J. Stroman, and to her sister, Gusta Mae Brewton. Mary Lemp specifically devised to Stroman and Brewton a ranch that she owned in Texas valued at $282,876. Mary Lemp bequeathed the remainder of her estate, consisting of cash and securities valued at approximately $650,000, to Stroman, the sole residuary legatee under the will.

The portion of Mary Lemp's will pertaining to the property specifically devised to her stepchildren provided:

(C) I give, devise, bequeath and appoint all right, title and interest of whatsoever kind I may have at the time of my death in my cooperative apartment[s] [1] located in Washington, D.C. and in any real property located outside the State of Texas, in equal shares to the three children of my deceased husband, Helena Lemp Duggan, John Lemp, Jr., and James F. Lemp, outright, as tenants in common, or in equal shares, outright, to the survivor or survivors of them who survive me. If all of my deceased husband's children predecease me, I direct that this devise shall lapse and become part of my residuary estate.

At the time of Mary Lemp's death, the Maryland, Pennsylvania and Virginia properties were free of encumbrances; the cooperative apartments had an outstanding mortgage debt of $2,515.37. Neither the real property nor the apartments was producing income for the estate.

Mary Lemp named in her will her stepson, James F. Lemp, and her attorney, George John Keto, co-personal representatives of the estate legally responsible for its preservation and maintenance during its administration. Before the various estate assets could be distributed, however, the Lemps brought suit against the estate on July 1, 1982, alleging that Mary Lemp's will was invalid. According to the Lemp complaint, Mary Lemp had violated a reciprocal will agreement that she had made with their deceased father before his death. Pursuant to their statutory obligations, the co-personal representatives continued to retain control over the estate's assets while the litigation proceeded.

On August 17, 1982, while the Lemp lawsuit was still in its early stages, the co-personal representative not involved in the lawsuit, George John Keto, petitioned the trial court for replacement of James Lemp as the estate's co-personal representative on the ground that Lemp's role in the litigation had

1. Although Mary Lemp referred to only one cooperative apartment in her will, she in fact owned two separate apartment units which no one disputes had been combined into one unit. As elaborated below, the personal representatives dealt with these units separately. We therefore treat them as two apartments for purposes of this appeal.

created a conflict of interest with his position as co-personal representative. On January 3, 1983, Judge Barnes approved James Lemp's removal, and on November 16, 1983, Lemp relinquished his role as co-personal representative. Control over the estate subsequently became vested in Keto and, to a lesser extent, in Alan Angerio, James Lemp's successor.[2]

At about this time, Keto initiated the sale of the two specifically devised cooperative properties pursuant to a request from each of the Lemps in 1982. On June 23, 1983, the estate sold one cooperative apartment for $115,000 ($29,017.66 net cash and a thirty-year note payable monthly at 11% interest). On December 5, 1984, the estate sold the second cooperative apartment for $52,000 ($20,000.00 net cash and a thirty-year note payable monthly at 11% interest). The total gross sales price of the two apartments, therefore, was $167,000, and the sales generated two monthly payments of $395.22 and $809.49.

After the sale of the first cooperative apartment, Keto established an escrow account at the Guaranty Bank and Trust Company in Merrifield, Virginia for the initial and monthly cash payments from the sale of the cooperative apartments, pending distribution of those assets to the Lemps. In order to pay the federal and state income taxes on the interest income from the notes and on the interest produced by the Guaranty Bank account, Keto used the estate's general account at First Union Bank. This account was the same one that Keto used to pay the mounting expenses associated with preserving and maintaining the estate properties, including the Lemps' properties in Maryland, Virginia, and Pennsylvania.

In August 1984, counsel for the estate learned during discovery proceedings that James Lemp had taken certain estate assets while serving as co-personal representative of the Mary Lemp estate. Hours after Mary Lemp's death, James Lemp had removed bearer bonds worth $55,000 from a safe deposit box he had jointly held with her. As a result of this discovery, Judge Barnes permitted the estate to bring a counterclaim against James Lemp for unlawfully converting estate assets. On September 6, 1985, the judge granted summary judgment for the estate both as to the Lemps' claim against the estate based on the alleged reciprocal will agreement and as to the estate's claim against James Lemp. These rulings were affirmed on appeal on February 28, 1989, in *Duggan v. Keto*, 554 A.2d 1126 (D.C.1989).

By early 1990, the estate's assets still remained undistributed, under the control of the co-personal representatives. The estate had continued to pay from its general account the preservation and maintenance expenses arising out of the Lemps' specifically devised properties, as well as the annual federal and state income taxes generated by the sale of the two cooperative apartments. These payments, which continued to be made out of the estate's First Union account, eventually totalled approximately $30,000 for preservation and maintenance and $9,000 for income taxes.

Finally, on September 28, 1990, Judge Haywood directed the estate to distribute its assets to the beneficiaries of Mary Lemp's will. After considering objections by W.J. Stroman to the fourth through the ninth accounts of the estate, however, the judge authorized the Mary Lemp estate to withhold from distribution to the Lemps the total amount spent maintaining and preserving their specifically devised property. On November 28, 1990, Judge Barnes entered an order refusing to reconsider the September 28 order and further ruling that the Lemps were responsible for $9,429.00 in income taxes paid by the estate on the earnings from the sale of the cooperative apartments.

2. The trial court in its January 3, 1982, order approved the appointment of Alan Angerio to succeed James Lemp, provided Angerio would be bound by the Delegation of Authority James Lemp filed on May 14, 1982, giving Keto exclusive authority to act on behalf of the estate in all matters relevant to the Lemps' lawsuit against the estate. The record does not supply the basis for the court's authority to fashion such an order, but no issue concerning that order is presented in this case. Hereafter, therefore, we refer to the estate's personal representatives as "Keto" for ease of reference.

On January 11, 1993, Judge Lopez considered additional objections to the twelfth and final account of the Mary Lemp estate. After reaffirming as "law of the case" the earlier rulings of Judge Haywood imposing on the Lemps both the maintenance and preservation costs of the specifically devised property and the federal and state taxes from the sale of the cooperative apartments, Judge Lopez permitted the estate to charge the Lemps interest for the use of the estate's residuary funds to pay for the costs associated with the specifically devised properties before distribution. The estate computed that interest at $10,541.72, based on an interest rate the estate had obtained for its other deposited funds.

In his order, Judge Lopez also denied James Lemp's belated request for $28,450 in compensation for services allegedly provided as co-personal representative of the estate. Both the estate and Stroman previously had objected to that request, in part, because of Lemp's illegal conversion of estate assets and his alleged "breach of fiduciary duty and dishonesty with respect to handling of the assets" of the Lemp estate. Relying on the equitable doctrine of "unclean hands," Judge Lopez held James Lemp disqualified from receiving any compensation for services he may have provided to the estate. The judge denied James Lemp's motion for reconsideration on November 12, 1993.

The estate ultimately distributed to John Lemp and Helena Lemp Duggan the notes received from the sales of the two cooperative apartments (with purchase price balances of $80,856.29 and $40,028.08), the real property in Maryland, Pennsylvania, and Virginia, and the assets contained in a Riggs (formerly the Guaranty) bank account.[3] In accordance with the various trial court rulings, however, the estate withheld $29,695.73 for the costs of preserving and maintaining the specifically devised property, $9,429.00 for the income taxes from the sale of the cooperative apartments, and $10,541.72 representing interest for use of the estate's residuary funds. Pursuant to an earlier agreement with the trial court, James Lemp's share was retained as a consequence of his earlier conversion of the bearer bonds.

The Lemps, as specific devisees of the Mary Lemp estate, and James Lemp, individually, appealed the trial court's rulings. The separate appeals were consolidated on October 31, 1994.

## II.

### *Appeal No. 93–PR–151*

The Lemps contend the trial court erred in allocating to them (1) the expenses totalling $29,695.73 for preservation and maintenance of their specifically devised property, (2) interest totalling $10,541.72 for use of the estate's residuary funds to pay preservation and maintenance expenses on their devised property, and (3) their pro rata share—$9,429.00—of the estate's income taxes attributable to interest on the proceeds from the sale of the two cooperative apartments.[4]

This case requires us to decide which beneficiaries—the specific devisees or the residuary legatee—should bear the expenses of

---

3. The estate distributed the notes on the cooperative apartments in 1990, title to the real property in 1991, and $32,740.66 in cash from the Riggs account to John Lemp and Helena Lemp Duggan in 1992.

4. The Lemps also contend they are entitled to (1) interest earned by the estate from the proceeds of the sale of the two cooperative apartments and to (2) a pro rata credit representing the portion of the estate's federal estate tax refund allocable to their devises.

The record indicates that the estate did account for the interest from the sale proceeds by applying a credit representing the interest earned by the estate from the sale of the cooperative apartments when it calculated the interest chargeable to the Lemps for use of residual funds

to pay the preservation and maintenance costs of their specific legacies. The estate reduced the amount of interest (originally $10,960.81) by $419.09, and thus arrived at the $10,541.72 figure the Lemps now contest. Because we conclude that the Lemps were not responsible for the costs of preserving and maintaining the property specifically devised to them, see *infra* Part II. B.-D., they are entitled to the full $10,960.81, representing the $10,541.72 withheld from them plus the $419.09 in interest.

The Lemps conceded at oral argument that the estate had allocated to them an additional credit representing their share of the federal estate tax refund. We therefore need not address that issue further.

preserving and maintaining specifically devised real property when distribution of the estate assets is delayed and the estate expends significant funds to preserve and maintain the specific devises. Relying on this court's decisions in *Martin v. Johnson*, 512 A.2d 1017 (D.C.1986) (*Martin I*), and *Johnson v. Martin*, 567 A.2d 1299 (D.C.1989) (*Martin II*), the Lemps argue that the residuary estate bequeathed to Mary Lemp's brother, W.J. Stroman, should bear those expenses. The personal representatives argue, to the contrary, that under well-settled common law principles the recipients of specifically devised property should bear related expenses. We agree with the Lemps; the trial court erred in allocating these expenses to the specific devisees.

### A.

In the *Martin* litigation, the testator specifically devised her home, encumbered by a deed of trust, to one niece and bequeathed the residue of her estate to her two other nieces and a nephew. More particularly, the testator's will devised her home to the niece "absolutely and in fee simple"; the residuary legatees received the balance of the estate "of whatever kind or wheresoever situated." *Martin I*, 512 A.2d at 1018. During administration of the estate, the personal representatives chose—in the absence of a contrary expression of intent in the will—to discharge the debt on the home from the estate's general funds before distributing it to the specific legatee. They also used the residuary funds to pay the real estate taxes, insurance premiums, repair bills, and utility bills for the house during the period of estate administration. The residuary legatees objected to this use of the residuary estate not only to exonerate the debt (*Martin I*) but also to preserve and maintain the specifically devised real estate (*Martin II*).

■ In the first appeal, *Martin I*, this court had to decide whether the personal representatives had properly used the residuary estate to exonerate the debt on the home. We upheld the exoneration.

The common law doctrine of exoneration provides generally that in the absence of controlling statutory provisions, or the expression of any contrary intention on the part of the testator, liens on specifically devised real property for which decedent was personally obligated, are to be discharged at the expense of the residuary legatee or distributee of the decedent's personal estate. Further, it has been repeatedly recognized as "well settled that the common law rule of exoneration is in effect in the District of Columbia."

We observe that the rule of exoneration operates only in the absence of an expression of intent by the decedent. Indeed, where the decedent's intent is discernible—either through the content of the will or surrounding circumstances—the rule of exoneration has no application.

*Id.*, 512 A.2d at 1021–22 (citations and footnote omitted). From *Martin I*, therefore, it is clear that exoneration is the rule in the District of Columbia absent a discernible intent of the testator to the contrary.

If exoneration applies to charge the residuary estate for removal of "liens on specifically devised real property for which the decedent was personally obligated," *id.* at 1021, who is responsible for payment of other expenses necessary to preserve and maintain that property pending final distribution to the specific devisees? According to *Martin II*, these expenses are allocable to the residuary legatee.

We summarized the applicable law in *Martin II*, noting a statutory change from the common law of this jurisdiction:

Under the common law and under the vast majority of state statutes governing descent and distribution, title to real property passes to the heirs or devisees immediately upon the death of the owner. Consequently, under the common law and such statutes, the devisees, not the residuary legatees, are responsible from the moment of the testator's death for paying the expenses incurred in maintaining and managing the property.

In 1980 the common law rule was changed in the District of Columbia by the Probate Reform Act, D.C. Law No. 3–72, § 101, 27 D.C.Reg. 2155 (codified in Title 20 of the District of Columbia Code

(1989)). With one exception not relevant here, the 1980 Act states that upon death "all property of a decedent ... shall pass directly to the personal representative, who shall hold the legal title for administration and distribution of the estate." D.C.Code § 20–105 (1989).[5] In abrogating the common law rule, the District of Columbia Council stated its intent to place on the personal representative the "responsibility for maintenance, taxes, and insurance of a decedent's property" until the property was either distributed to the specific devisee or otherwise allotted. The 1980 Act also empowers the personal representative to pay expenses specifically related to the maintenance and administration of the devised property. See D.C.Code § 20–741(h), (j), and (r) [6]....

Reading these provisions together, we conclude that the statute, by not only placing on the personal representative the responsibility for maintaining the decedent's property until it is distributed but also authorizing him or her to pay the expenses of doing so, necessarily imposes the cost of such maintenance on the entire estate (in particular, the residue) when the property is subject to exoneration. When the testator's intent is to pass the property whole or in kind to the devisee, without encumbrance, and when—as in this case—the property generates no income, we see no unfairness in permitting the residue to bear the expense of maintaining the property prior to distribution.

*Martin II*, 567 A.2d at 1302–03 (citations and footnote omitted). We stressed in a footnote that "our holding [was] limited to cases in which the property is subject to exoneration and produces no income." *Id.* at 1303 n. 4.

We were especially comfortable with interpreting the Probate Reform Act in this way because of its contrast in this particular respect with the Maryland Estates and Trust Code on which our local Act was patterned. *See id.* at 1304 n. 5 (noting D.C. Council revised District's code because Maryland had revamped its estate law in 1969 and pointing out similarities between District's and Maryland's probate codes); *see also* Md. Est. & Trusts Code Ann. § 7–401 (1991 Repl.) (general powers of personal representative same as those set forth in D.C.Code § 20–741). The Council had declined to enact the provision of the Maryland statute requiring a specific devisee to pay his or her share of the preservation and maintenance expenses of devised property. *See* Md. Est. & Trust Code Ann. § 7–304(b)(1). From the absence of such a provision, we inferred that "the Council deliberately decided to make the estate, not the devisee, responsible for paying the expenses connected with preservation of specifically devised property." *Martin II*, 567 A.2d at 1304.

In sum, we announced in *Martin II* that if the exoneration rule applies—*i.e.*, if the specific devisee is to take the property without encumbrance when the testator has not indicated otherwise—then at least when the property generates no income that could be used to offset expenses, the expenses of preserving and maintaining the property during the period before final distribution shall be chargeable to the residuary estate, not to the devisee.

### B.

 In its September 28, 1990, order the trial court held the *Martin* decisions inapplicable to the Lemps' specifically devised property in Maryland, Pennsylvania, and Virginia because, absent a mortgage debt or other encumbrance at time of death, "the issue of

---

5. D.C.Code § 20–105 (1989 Repl.) provides in relevant part that "all property of a decedent ... shall pass directly to the personal representatives, who shall hold the legal title for administration and distribution of the estate."

6. D.C.Code § 20–741 (1989 Repl.) empowers a personal representative to:
 (a) take possession of and hold assets owned by the decedent pending distribution or liquidation ...;

(h) obtain insurance to protect the property of the estate against damage, loss, and liability ...;
(j) pay taxes, assessments, and other expenses incident to the administration of the estate; [and]
(r) pay valid claims and distribute the estate as provided in [Title 20 of the Code]....

exoneration [did] not arise as to those devises." This reading of *Martin I & II* is too narrow. Those cases do not say that specifically devised property must be encumbered at time of death to present an issue of exoneration. The *Martin* decisions stand for the broader proposition that (1) the exoneration rule applies in all cases, absent a testator's intent to the contrary; (2) the rule has force during the entire period before distribution of estate assets, not merely as of the date of the testator's death; and (3) it applies not only to encumbrances, such as mortgage debts and other liens, but also—by statute modifying the common law—to the expenses reasonably necessary to preserve and maintain the property before its final distribution.

We read *Martin I & II* in this way because the trial court's reading does not work. The result in *Martin II*, the decision controlling this case, did not turn on whether the devised property was encumbered by a mortgage or other lien at the time of the testator's death. The result, rather, was driven by the fact that the testator did not manifestly intend the specific devisee to pay any encumbrance on the devised property (thus it was subject to exoneration), coupled with the fact that the personal representative, not the devisee, had the legal responsibility to preserve and maintain the property pending its final distribution—and had statutory authority to pay the expenses for doing so from the estate's residuary funds. *See Martin II*, 567 A.2d at 1303. There is no logic to an argument that the rule applicable to preservation and maintenance expenses when the property is *not* encumbered by a mortgage at time of death should differ from the rule that applies when the property is so encumbered; the Probate Reform Act itself makes no such distinction, and the devisee is in the same position in either case, unable to control decisions about the property during the period before distribution.

A hypothetical case demonstrates why the rule should be the same whether the devised property is actually encumbered or not at the time of the testator's death. Suppose there is no encumbrance until the personal representative temporarily mortgages the property after the testator's death in order to generate cash to meet immediate needs of estate administration;[7] or suppose a creditor obtains a lien against the property before its distribution to the devisee. Logic would preclude our saying that such an event would be too late for exoneration or, on the other hand, that the event would trigger exoneration of a belated debt but yet would not permit imposition of preservation and maintenance expenses on the residuary estate.

■ In sum, we cannot accept the trial court's reading of *Martin I & II* that limits the availability of exoneration—assessment of preservation and maintenance expenses during the estate's holding period—to situations where the property was encumbered in some way at the time of death. The critical facts are the testator's intent considered in the light of a rebuttable presumption of exoneration, and the personal representative's— not the specific devisee's—control of the property for the period pending final distribution.

■ In this case, although there were no encumbrances on the Maryland, Pennsylvania, and Virginia properties specifically devised to the Lemps (in contrast with the *Martin* devisee), there was, in effect, a presumption—rebuttable by demonstrating a testator's intent to the contrary—that the property was subject to exoneration as broadly understood to embrace preservation and maintenance expenses prior to distribution.

### C.

■ Before addressing the presumption of exoneration in light of the facts here, we should note that Judge Haywood treated the cooperative apartments differently from the Maryland, Pennsylvania, and Virginia real estate for purposes of exoneration analysis. The judge declined to allocate the preserva-

---

7. D.C.Code § 20–741(u) (1989 Repl.) empowers the personal representative to:

(u) invest in, sell, exchange, or lease personal property; and borrow money for the purpose of protecting real or personal property (and pledge property as security for such loan).

tion and maintenance expenses of the cooperative apartments to the residuary estate on the narrower ground that a cooperative is not real property, and thus that the doctrine of exoneration, by definition, did not apply.[8]

We have said that cooperative apartment property is a "legal hybrid[ ]" of real and personal property. *Clydesdale, Inc. v. Wegener,* 372 A.2d 1013, 1015 (D.C.1977) (recognizing that "cooperative associations are, in a sense, legal hybrids" sharing traits of leasehold and real property ownership in action for possession by tenant against cooperative apartment association). For reasons that follow, we believe such a cooperative falls within the scope of *Martin II*'s exoneration rule.

A cooperative property owner holds shares of stock in the cooperative corporation that owns the apartment; the owner does not have a fee interest in the apartment where he or she resides. Nonetheless, we cannot ignore the fact that cooperative housing is a method for marketing a housing project that appears to be no different from a multifamily building, such as a condominium regime, where each homeowner holds legal title to the apartment in fee simple. *See Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1352 (D.C.1978) (recognizing cooperative housing is a way to supply mass-produced housing); *Clydesdale, Inc.,* 372 A.2d at 1015 (observing cooperative housing is vehicle for common ownership of property). It is doubtful, to say the least, that a testator who disposes of a cooperative apartment will think of it not as real property but as personalty.

■ We conclude, accordingly, that the rationale for the exoneration rule applies with as much force to a cooperative housing facility as it does to any real property. *See Berman,* 391 A.2d at 1357 (concluding strict

liability doctrine applied to injuries arising after sale of interest in cooperative apartment on ground that transaction was similar to sale of new home to which strict liability doctrine does apply); *Hicks v. Bigelow,* 55 A.2d 924, 926 (D.C.1947) (concluding that although cooperative property owner did not own apartment in fee simple, she was in substance the owner and thus entitled to maintain suit for possession as landlord under the Rent Act); *In re Pitts' Estate,* 218 Cal. 184, 22 P.2d 694, 697–98 (1933) (decedent's substantive interest in cooperative apartment constituted real property under California Code of Civil Procedure); 15A Am. Jur. 2D *Condominiums and Co-operative Apartments* § 62, at 894 (1976) (cooperatives include elements of ownership, as well as stock and leasehold rights).[9] Furthermore, the fact that a devise is encumbered by a mortgage increases the likelihood that the testator intended exoneration, as well as payment of preservation and maintenance expenses from the residuary estate—absent a clear expression of intent to the contrary.

## D.

■ In considering both the Maryland, Pennsylvania, and Virginia real estate and the two cooperative apartments, we conclude that the presumption of exoneration was unrebutted here. This court looks to the "four corners of the will" in determining the testator's intent. *Martin I,* 512 A.2d at 1022. Mary Lemp devised to the Lemps "all right, title, and interest of whatsoever kind I may have at the time of my death in my cooperative apartment[s] located in Washington, D.C. and in any real property located outside the state of Texas." Although the will did not include a "pay all debts" clause, this

---

8. Approximately one-third of the total preservation and maintenance costs of the Lemps' specifically devised properties was attributable to the parcels of real estate in Maryland, Pennsylvania, and Virginia and two-thirds were attributable to the cooperative apartments. Specifically, from 1982 to 1985, the estate spent over $19,000 in preservation and maintenance costs for the two cooperative apartments. The bulk of this expense was for management services. The estate spent roughly $650 each year on preserving and maintaining the real estate.

9. In characterizing a cooperative apartment as realty for purposes of applying the exoneration rule, we do not address a question left open in *Martin I:* "whether, in light of the Probate Reform Act, the doctrine [of exoneration] would operate to require exoneration of a debt in specifically devised personalty at the expense of a general residuary gift." 512 A.2d at 1024 n. 9.

omission by itself does not rebut the presumption of exoneration. *See Martin I,* 512 A.2d at 1022 (significance of "pay all debts" clause matter of dispute); Thomas E. Atkinson, LAW OF WILLS § 137, at 765 (2d ed. 1953) (exoneration unaffected by presence or absence of pay all debts clause).

■■■ Furthermore, contrary to Judge Haywood's alternative ruling on the cooperative apartments (assuming *arguendo* they were realty), we do not believe the devise of "all right, title, and interest of whatever kind I may have at the time of my death" effectively negates exoneration by necessarily implying that the devisee takes subject to a mortgage. While one could read that language to suggest a mortgage limitation on the devise, that language is equally consistent with the idea that the testator intended to devise his or her full fee interest (*e.g.,* 30%, 70%, 100%) free and clear. *See Kent v. McCaslin,* 238 Miss. 129, 117 So.2d 804, 807 (1960) (testator's gift of "my interest" in cotton gin real property denoted "title," not merely "equity subject to any liens thereon," and thus absent "clearly implied" intention not to exonerate, specific devisee took property free of vendor's lien); *see also Tobiason v. Machen,* 217 Md. 207, 142 A.2d 145, 146–47 (1958) (devise of "my right, title and interest" in realty not limited to "equity of redemption," absent express provision exonerating personal estate from payment of testator's debts, especially because mortgage debt was incurred after execution of will). The language of devise itself, therefore, is inconclusive.

Viewing Mary Lemp's will as a whole, we see it "yields no clear picture" of her intent as to exoneration, one way or the other. *Martin I,* 512 A.2d at 1023. This ambiguous situation, therefore, is "precisely such a circumstance [where] the common law rule of exoneration is operative." *Id.* Thus, the first *Martin II* limitation is met: this is a case "in which the property is subject to exoneration." *Martin II,* 567 A.2d at 1303 n. 4.

Appellees have not argued, moreover, that the devised property failed to meet the second *Martin II* limitation. Unquestionably, the property "produce[d] no income" for the estate during the period it generated preservation and maintenance expenses. Appellees note in their brief that, after the cooperative apartments were sold, the notes representing the balance of the purchase price, as well as the account into which payments on the notes were being made, generated interest income. But in acknowledging that the Lemps were entitled to this income, appellees do not argue that income on proceeds from the sale of exonerated property vitiates satisfaction of the second *Martin II* limitation.[10]

Accordingly, we conclude that the preservation and maintenance expenses attributable to the specifically devised property were chargeable to the residuary estate. We recognize that the longer the estate holds specifically devised property subject to preservation and maintenance expenses, the greater the burden on the residuary legatees, especially when, as in this case (and in the *Martin* litigation), the specific devisees have initiated litigation against the estate that precludes distribution of the property for a long while. The possible inequities in such a situation, however, cannot affect the basic rule to be applied to determine responsibility for preservation and maintenance expenses: specific devisee or residuary legatee? A residuary legatee, however, may have an action for breach of fiduciary duty against the personal representative for unnecessary delay in distributing estate assets, *see Martin II,* 567 A.2d at 1305, or perhaps even against the specific devisee for tortious interference with estate distribution. But no such claim or issue is presented here; we consider only the proper application of the exoneration rule, as extended to cover preservation and maintenance expenses for specifically devised property.

### E.

■■■ The Lemps next contend the trial court erred in charging them interest for use

10. Nor have appellees contended that the property appreciated in value over the period of distribution and that appreciation constituted "income." We therefore leave for another day the issues of whether the residuary estate should pay preservation expenses when the specific legacy produces income, *see Martin II,* 567 A.2d at 1304 n. 4, and, if not, whether appreciation in value can be "income" in this context.

of the estate's residuary funds to pay the preservation and maintenance expenses of the specifically devised properties. Because, as we have held, the trial court erred in allocating those expenses to the Lemps, this contention is correct. The $29,695.73 expended by the estate to preserve and maintain the Lemps' specifically devised properties was not an extension of credit; it was payment of expenses properly charged to the residuary estate. Thus, the trial court erred in charging the Lemps interest for use of residuary funds the Lemps, as a matter of law, did not use. See *supra* note 4.

### F.

 Finally, the Lemps argue the trial court erred in charging them for the federal and state income taxes payable on the $111,-226.62 in interest income generated by the notes payable by the purchasers of the cooperative apartments and later distributed to the Lemps. More specifically, as a consequence of the sale of the two apartments, the estate paid income taxes on the interest earned from the two thirty-year notes, as well as from the cash account at Riggs holding that accumulating interest income, before distribution of the proceeds of that account to the Lemps. See D.C.Code § 20–741(j), *supra* note 6. We conclude that the trial court properly allocated the income taxes to the Lemps.

In deciding who is responsible for income taxes on the interest generated by the notes payable on the sale of the apartments, we must emphasize that no one questions the attribution of this income to the specific devisees. The residuary legatees do not claim it (nor, as indicated earlier, do they contend it should be applied to the previously incurred preservation and maintenance expenses). Thus, we proceed from the premise that the specific devisees are entitled to the income, as well as to the payments of capital, from the sale of the cooperative apartments.

 The fact that the Probate Reform Act and *Martin II* authorized the personal representative to "pay taxes ... incident to

the administration of the estate," D.C.Code § 20–741(j), *supra* note 6, does not suggest that estate income taxes not directly related to real property are allocable to the residuary estate in the way that real estate taxes would be under *Martin II. See Martin II*, 567 A.2d at 1303. Real estate taxes are "preservation" expenses since failure to pay them could result in loss of the property. In contrast, income taxes imposed on interest income attributable to a bank account holding the proceeds from a sale of real estate bear no relationship to preserving or maintaining that real estate. The realty is gone from the estate; it is now represented by cash, ready for distribution, reflecting the value of fully exonerated—fully preserved and maintained—real estate.

In sum, a transmutation had occurred from exonerated realty to income-generating property. Because the specific devisees (the Lemps) became entitled, for the first time, to income traceable to the devise, they became responsible, as the constructive owners of the exonerated principal, for income taxes imposed on the income from that principal. *See In re Bixby's Estate*, 140 Cal.App.2d 326, 295 P.2d 68, 73 (1956) (where specific legatee of stock had right to income upon which estate owed income taxes, "since such [income] taxes are the subject of and measured by the income, it seems only fair that they should be paid [from the income producing property]"); *In re Reichel's Estate*, 28 Cal.App.3d 156, 103 Cal.Rptr. 836, 838–39 (1972) (same); Thomas E. Atkinson, LAW OF WILLS, § 135, at 751 (2d ed. 1953) (specifically devised property "must bear taxes thereon"). The trial court, therefore, properly charged the Lemps with their pro rata share of the estate's income taxes attributable to their specific devises.[11]

### III.

*Appeals Nos. 93–PR–135 & 94–PR–1282*

James Lemp contends the trial court erred in failing to make adequate findings of fact in its January 11, 1993 order denying his request for $28,450 in compensation for ser-

---

11. In their briefs, the Lemps have not argued that they would have paid less in taxes, as individuals, had the proceeds of sale been distributed

to them immediately after the sale of the property rather than retained in the estate for years, vulnerable to higher income tax rates.

vices to the estate as one of the original co-personal representatives. Lemp stresses, in particular, that D.C.Code § 20–751 compels a trial court to make specific findings of fact even when the denial of compensation is not related to any of the factors enumerated in § 20–751. We do not agree; the trial court's conclusion that Lemp had disqualified himself from receiving compensation because of "unclean hands" did not necessitate such fact-finding.

■ In its January 11, 1993, order, Judge Lopez explained the basis for denial of Lemp's petition:

This court cannot, in good conscience, approve the petition. James Lemp resigned as co-personal representative to avoid removal. This was necessary because he was accused of converting estate assets which he refused to surrender. Litigation was necessary, and it even involved the appeals process. The estate ultimately prevailed. Obviously, he created a large, unnecessary, legal expense for the estate.

Surely this Court does not seek to punish Mr. Lemp for exercising his legal rights by litigating for assets to which he claimed a right of ownership. Nonetheless, his case was not even a close one, he lost on summary judgment. Furthermore, although confirmation may be difficult, his list of services includes time spent in the conversion. What is even more shocking to the Court is his attitude after all has been said and done. There were no apologies; at the status hearing of August 21, 1992, he described the conversion matter as though it were a minor technicality. James Lemp comes to this court with unclean hands, his claim must be denied. [citations omitted]

■ D.C.Code § 20–751(f) provides that, before the court authorizes reasonable compensation for an estate representative, it "shall consider the factors" set forth in subsection § 20–751(c)[12] and evaluate any filed exception to the request. Because these statutory factors ordinarily are applicable to a request for compensation, this court has made it clear that, when a trial court grants or denies a request based on these factors, the failure to make appropriate findings of fact as to each is an abuse of discretion. *See Godette v. Estate of Cox,* 592 A.2d 1028, 1032 (D.C.1991); *Williams v. Ray,* 563 A.2d 1077, 1080 (D.C.1989).

When, however, the trial court predicates denial of a request for compensation on a ground unrelated to § 20–751(c) factors—a possibility that James Lemp does not question—the trial court is not required to make findings of fact on these factors for an obvious reason: such findings would provide absolutely no assistance to this court in reviewing the trial court's order. *See Godette,* 592 A.2d at 1033 (findings of fact not required where denial of compensation predicated not on § 20–751(c) factors but on independent grounds and where record adequate to support denial).

Here, the trial court, acting as a court of equity, denied James Lemp's request on the basis of his "unclean hands" rather than on the basis of the § 20–751(c) factors. This court cannot say the trial court erred by invoking its equity power to deny the request without referencing the statutory factors, since those factors had no bearing on the court's equitable analysis. *See Poe v. Noble,* 525 A.2d 190, 195 (D.C.1987) ("where the claim related to a subject matter within the responsibility of the division [of the trial court], that division may rely on general

**12.** D.C.Code § 20–751(c) (1989 Repl.) lists the following factors:

(1) the reasonable relationship of proposed compensation to the nature of the work performed;

(2) a statement by any attorney employed by the personal representative that as soon as feasible the attorney gave to the personal representative an estimate of costs and any change in costs for work to be performed with respect to the administration of the estate;

(3) the reasonableness of the time spent, including the number of hours spent and the usual hourly compensation for the work performed;

(4) the results achieved; and

(5) a statement by the personal representative or special administrator that all of the time limitations imposed by the provisions of this title or by the Rules have been met, or, in the event that all of the time limitations were not met, the dates such compliance was due, the actual date of compliance and the reasons for the delay.

equity powers to adjudicate the claim and award relief"). The trial court accordingly did not err in failing to make particularized findings of fact on the irrelevant § 20–751(c) factors.

Nor must we remand for further factfinding as to unclean hands. Specific findings of fact are often needed to aid appellate courts in reviewing a trial court or agency decision. However, in cases where it is clear from the legal analysis employed, and from the record itself, that the court does not need the aid of particular kinds of factual findings, a remand for further fact-finding would be a waste of time and create needless expense. *See Don't Tear It Down, Inc. v. District of Columbia Dept. of Hous. & Community Dev.,* 428 A.2d 369, 378 (D.C.1981); *Urbain v. Knapp Brothers Mfg. Co.,* 217 F.2d 810, 816–17 (6th Cir.1954). In this case, the basis of the order denying compensation is clear from, and adequately supported by, the record. *See Simpson v. Lee,* 499 A.2d 889, 893 (D.C.1985) (failure to make specific findings required by Super. Ct. Civ. R. 52 not reversible error where ample record supported legality of order); *Wisconsin Ave. Assoc. v. 2720 Wisconsin Ave. Coop. Ass'n.,* 385 A.2d 20, 23 (D.C.1978) (same).

The record here indicates that James Lemp, while serving as a co-personal representative, participated in a lawsuit against the estate which the trial court resolved against him on summary judgment. He refused to resign as co-personal representative despite the conflict of interest the litigation created; he resigned only after the estate brought an action to remove him. Twice he unlawfully opened Mary Lemp's safe deposit box and converted estate assets totalling $55,000 dollars. He failed to divulge this conversion for two years and admittedly filed a false affidavit stating that he had not removed anything of value from the safety deposit box when he opened it a second time. On the basis of these undisputed facts, the trial court properly invoked the "unclean hands" doctrine in denying Lemp's request for compensation. *See In re Taft's Will,* 145 Misc. 435, 260 N.Y.S. 294, 299 (N.Y.Surr.Ct.1932); RESTATEMENT (SECOND) OF AGENCY § 469 cmt. a (1958) ("An agent is entitled to no compensation for a service which constitutes a violation of his [or her] duties of obedience. This is true ... even though the agent believes that he [or she] is justified in so acting.") (citation omitted).

\* \* \*

We reverse the trial court's order imposing on the Lemps, as specific devisees, the expenses for preservation and maintenance of the devised property and, correspondingly, assessing interest for use of estate funds. We affirm the trial court's order charging the Lemps with their pro rata share of the estate income taxes attributable to their specific devises. We also affirm the order denying James Lemp's request for compensation. We remand for further proceedings consistent with this opinion.

*So ordered.*