**Lucile KELLEY, Appellant,**

v.

**BROADMOOR COOPERATIVE APARTMENTS, Appellee.**

No. 95–CV–847.

District of Columbia Court of Appeals.

Argued March 19, 1996.

Decided May 16, 1996.

---

Douglas V. Rigler, Washington, DC, for appellant.

William John Hickey, with whom Thomas Collier Mugavero, Washington, DC, was on the brief, for appellee.

Before FARRELL, KING, and REID, Associate Judges.

REID, Associate Judge:

Appellant Lucille Kelley filed a complaint for monetary damages and injunctive relief against appellee Broadmoor Apartments, Inc., a cooperative housing association. She challenged the imposition on non-resident owners of a surcharge on the rental of their apartments. She alleged that the surcharge violated her Perpetual Use and Equity Contract with the Broadmoor, and the bylaws of the cooperative. The trial court granted summary judgment to the Broadmoor. We affirm.

## FACTUAL SUMMARY

In 1948, the Broadmoor apartments, located at 3601 Connecticut Avenue, N.W., became a non-profit housing cooperative known as Broadmoor Cooperative Apartments, Inc. Broadmoor sold "perpetual use and equity contracts" to residents and potential residents. Appellant Lucille Kelley and her now deceased husband acquired a perpetual use and equity contract for Apartment 613 on November 28, 1958, as tenants by the entirety. For over thirty-five years, Mrs. Kelley was a resident of Broadmoor. In April 1994, at the age of 95, she moved to a retirement home.

Mrs. Kelley wanted to rent her apartment to her niece, and sought the written consent of the Broadmoor Board of Directors, as required by § 6(d) of the contract, and § 62 of Broadmoor's bylaws. Section 6(d) of the contract provided in pertinent part:

> 6. The Member, so long as he shall comply with the terms and conditions hereof, shall peacefully enjoy the exclusive use of the purchased apartment and, in common with others similarly entitled, shall have the use and enjoyment of all community property of the Co-operative. In the interest of the common welfare of all members of the Co-operative, the Member expressly agrees as follows:
>
> (d) That he will not lease or permit the sub-leasing of the purchased apartment, or transfer the use or possession thereof without the written consent of the Co-operative, and any approved leasing shall be on standard contract form prepared and furnished by the Co-operative.

Section 62 of the bylaws specified in relevant part that:

> The control by the Board of Directors of the right of occupancy extends to leasing or subleasing by either resident or equity members. Application for authority to lease or sublease shall be made to the Board of Directors in the form and upon such terms as it may, from time to time, prescribe.... Leases and subleases shall not extend beyond a six-month period without specific approval of the Board of Directors....

As of May 6, 1991, the fee imposed for the leasing of an apartment was "$100.00 charged to the owner; $100.00 placed in escrow by leasee renting the apartment." The owner was subjected to a lease renewal charge of $100.00 every six months.

Approximately three months after Mrs. Kelley sought to lease her apartment to her niece, the Board voted to eliminate the lease renewal fee. In its place the Board decided to impose a surcharge of 5% on the monthly operating assessment of owners for each rented apartment, and an escalating additional 5% surcharge on the assessment each rental year until the maximum of a 25% surcharge was reached in the fifth year. The Board's intent, as later articulated by its President, was "to promote owner occupancy, maintain the value of each owner's investment in his or her home, and ensure a consistently high quality of life for Broadmoor residents." On July 22, 1994, the Board informed resident members of the Broadmoor that the surcharge would become effective on September 1, 1994.

Mrs. Kelley filed a complaint in the trial court on August 30, 1994. Her complaint alleged that the surcharge (1) breached the terms of the contract; (2) breached the bylaws; (3) constituted age discrimination, in violation of D.C.Code §§ 1–2501 *et seq.*; (4) constituted tortious interference with her contract; and (5) "breached the Board's fiduciary duty to operate and manage the Broadmoor in a fair, reasonable and non-discriminatory manner." Mrs. Kelley sought injunctive relief and monetary damages.

On December 7, 1994, the trial court ordered the Board to approve Mrs. Kelley's niece's lease and allow her to occupy Apartment 613. In addition, Mrs. Kelley was ordered to pay the rental surcharge, without prejudice to her continuing challenge to its validity. Mrs. Kelley moved for summary judgment on February 16, 1995. On March 1, 1995, the Broadmoor opposed Mrs. Kelley's motion, and filed a cross-motion for partial summary judgment. The trial court issued an order dated March 9, 1995, denying Mrs. Kelley's motion for summary judgment and granting the Broadmoor's motion as to

the breach of contract count of Mrs. Kelley's complaint. The order stated in part:

> Under paragraph 6 of the Perpetual Use and Equity Contract, plaintiff's apartment was to be used only as a private residence for the use of the plaintiff, her family, guests, and servants. Plaintiff may not lease the apartment without the written consent of defendant. The contract places no restrictions on the defendant's exercise of that consent power. Nothing in the contract precludes defendant from conditioning such consent upon payment of a fee, calculated as a stated percentage of the monthly assessment. *Accord, Vernon Manor Co-op. Apartments v. Salatino,* 15 Misc.2d 491, 178 N.Y.S.2d 895, 900–902 (1958).

Subsequently, the parties stipulated to the dismissal of count three of Mrs. Kelley's complaint, without prejudice.

On May 5, 1995, the Broadmoor moved for summary judgment on the counts concerning the alleged breach of the bylaws, the alleged invalid exercise of power by the Board, and the alleged breach of fiduciary duty. On May 25, 1995, Mrs. Kelley filed an opposition and cross-motion. In addition, she filed a "renewed motion for summary judgment." The "renewed motion" was opposed on the ground of untimeliness. In an order dated June 1, 1995, the trial judge granted Broadmoor's motion, stating:

> [F]or the reasons set forth in the instant motion, and by the Court in granting defendant's earlier motion for summary judgment, it is clear that there is no genuine dispute as to any material issue and that defendant is entitled to judgment as a matter of law.

The trial court denied Mrs. Kelley's renewed motion for summary judgment in an order dated June 30, 1995. The order specified that "for reasons stated in defendant's opposition, the motion is both untimely and without merit." On June 30, 1995, Mrs. Kelley appealed the trial court's orders dated March 9, 1995, June 1, 1995, and June 30, 1995.

---

**1.** Mrs. Kelley apparently referenced an old section 45 of the bylaws. Current section 45 gives the President of the Board, with the approval of the Board, the authority to appoint advisory

## ANALYSIS

Mrs. Kelley argues that: (1) the surcharge violates her " 'valuable equity right' of rental" under the contract; (2) section 45 of the bylaws [1] "[protects her] against any adverse change—such as a surcharge—in her 'valuable equity right' of rental", and section 68 of the bylaws precludes the Board from amending the bylaws in a manner that would diminish her alleged equity right; and (3) the Board's action in imposing the surcharge was *ultra vires* because "it is subjective, discriminatory, and unreasonably calculated to further the interests of some owners at the expense of others." The Broadmoor asserts that Mrs. Kelley has (1) no " 'valuable equity right' of rental" under the contract; and (2) no valid "claim for breach of fiduciary duty or 'breach of the bylaws and the powers of the corporation'."

### Standard of Review

"In reviewing a motion for summary judgment, 'we must assess the record independently ... [and view it] in the light most favorable to the party opposing the motion'." *Walton v. District of Columbia,* 670 A.2d 1346, 1353 (D.C.1996) (referencing *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C.1994) (en banc)). *See also Young v. Delaney,* 647 A.2d 784, 788 (D.C.1994). "We will affirm the entry of summary judgment if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law'." *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983) (quoting Super. Ct. Civ. R. 56(c)). Moreover, "summary judgment is appropriate where a contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Id.* at 815 (referencing *Glekas v. Boss & Phelps, Inc.,* 437 A.2d 584, 587–88 (1981)). Whether a contract is ambiguous is a question of law. *Id.* (referencing *Clayman v. Goodman Properties, Inc.,* 171 U.S.App. D.C. 88, 96, 518 F.2d 1026, 1034 (1973)). We

---

committees. Section 47 of the current bylaws provides that the Board may not adopt rules that are "inconsistent with or adversely affect rights and obligations in use contracts."

have previously determined that "a contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings...." *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.1973) (citation omitted).

## The Question Of A Valuable Equity Right Of Rental

█ Mrs. Kelley claims she has a "valuable equity right"—a "full proprietary right [ ]"—of rental under the contract which the surcharge violates. We disagree. Neither the perpetual use contract nor the bylaws grant an equity right of rental to Mrs. Kelley in the sense she means: an essentially unrestricted right to rent subject only to a qualified right of the Board to approve the tenant. The words of each document are clear and unambiguous in giving owner's only a highly restricted right to rent. Section 6(d) of the perpetual use contract conditions the owner's lease or the sub-lease of an apartment on "the written consent of the Co-operative." Section 62 of the bylaws states that "[t]he control by the Board of Directors of the right of occupancy extends to leasing or subleasing by either resident or equity members" and "[a]pplication for authority to lease or sublease shall be made to the Board of Directors in the form and upon such terms as it may, from time to time, prescribe." While § 61 of the bylaws, which concerns the sale or transfer of a contract, recognizes that "valuable

equity rights arise from the purchase of use contracts," [2] § 62 regarding leasing and subleasing does not.[3] Nonetheless, Mrs. Kelley maintains that the case of *Abbot v. Bralove*, 81 F.Supp. 532 (D.D.C.1948), *aff'd* 176 F.2d 64 (1949), is authority for the existence of a valuable equity right of rental under the contract. We are not persuaded by her argument.

Although it construed the Broadmoor's perpetual use and equity contract, *Abbot* involved a different issue—the status or characterization of purchasers of cooperative apartments, under the Emergency Rent Act. There the trial court (affirmed on appeal) concluded that the purchasers were "landlords ... entitled ... to the possession of apartments purchased by them for their personal use and occupancy." 81 F.Supp. at 540. As such, they had the right to oust from their purchased apartments tenants by sufferance who had resided in the building prior to conversion. Although the trial court in *Abbot* cited certain indicia of ownership, none of these indicia included a valuable equity right of rental.[4]

Mrs. Kelley also relies upon an affidavit submitted by Edmund C. Flynn who, together with his father, converted the Broadmoor into a cooperative. He asserted that in 1947 and 1948, "it was understood and agreed that [the original] members [of the cooperative] had the right to rent their apartment units subject to the provision that the persons

---

**2.** Section 61 of the bylaws specifies that:

> The primary object of this Corporation is to operate and maintain its property on a mutual and cooperative basis for the housing needs of resident members. Coupled, however, with the right of occupancy, valuable equity rights arise from the purchase of use contracts. To the fullest degree, those equity rights are deemed transferable, either absolutely or by way of pledge. The right of occupancy under the use contract is, nevertheless, a matter of discretionary decision of the Board of Directors and every transfer to resident membership, with its right of occupancy as defined in the use contract, is subject to the approval of the Board of Directors. Stated otherwise, the approval of the Board of Directors shall not be required in a case of a transfer of a use contract except where the transferee desires the status of resident membership. The right of

occupancy shall not be denied any transferee or vendee who, at the time of such transfer or sale (or the death of a resident member, if the transfer results from his death), is or was the resident member's lawful spouse or was related to the member by blood within the second degree.

**3.** *See* the text of § 62, *supra*.

**4.** The indicia of ownership cited by the trial court in *Abbot* included (1) a capital investment "in exchange for a personal right of occupancy" of a designated apartment; (2) allocation of some portion of the capital outlay to payment of the mortgage (principal and interest); (3) control over "decorations and re-arrangements" of an individual apartment; and (4) payment only of "maintenance and operation costs" after encumbrances on the title to the property had been paid. 81 F.Supp. at 538–40.

renting the apartment be approved by the Board," and that "the Broadmoor and its Board never intended, nor interpreted, the Perpetual Use and Equity Contracts to give the Board the right to impose such surcharges on the monthly operating assessment or any other financial penalty as a condition of renting the apartments." Furthermore, his affidavit stated that the equity rights accorded under the contract "were intended to include the right to rent the apartment without payment of any surcharge or other penalty of a nature or amount to discourage rentals." .

 Even if the Flynn affidavit established the intent of the Broadmoor to convey a valuable equity right of rental through the contract, it constitutes extrinsic evidence and may not be used to vary the terms of an unambiguous contract. "Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous." *1010 Potomac Associates v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C.1984). Since the contract is not ambiguous, the Flynn affidavit may not be used to vary its terms.

For the foregoing reasons, we conclude that the trial court did not err in determining that the contract confers no valuable equity right to rent apartment 613 on Mrs. Kelley. Moreover, we find no basis for such a right in either the *Abbot* decision or the bylaws. Both the contract and the bylaws condition the rental of an apartment on the consent of the Board. Accordingly, we affirm the trial court's order dated March 9, 1995.

### The Bylaws, Fiduciary Duty and Powers Of The Board

 Mrs. Kelley contends that the Board violated the Broadmoor's bylaws, breached its fiduciary duty to its members, and ex-

ceeded its powers in imposing a surcharge to discourage rentals. The Broadmoor points to the broad powers given to the Board by both the contract and the bylaws. Mrs. Kelley relies on §§ 47 and 68 of the bylaws to advance her position. Both of these sections preclude the Board from enacting rules that are "inconsistent with" or "adversely affect" rights under the contract. Since, as we have determined, the contract grants no valuable equity right of rental, the surcharge could not be inconsistent with or adversely affect such a non-existent right.

Sections 21, 47, 50, 61 and 62 of the bylaws make it exceedingly clear that the Board has broad powers with respect to the management and operation of the Broadmoor. Section 21 states:

> The property and business of the Corporation shall be managed by a Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members.

Section 47 provides:

> The Board may from time to make appropriate rules and regulations controlling use of apartments, garage spaces, lobbies and commonspaces and facilities, including the ground and walks and all member[s], their families, guests, employees and subleases, shall comply with such rules and regulations. No such rule or regulation shall be inconsistent with or adversely affect rights and obligations in use contracts.

Mrs. Kelley makes no argument based upon § 50 of the bylaws which addresses the method for calculating and imposing monthly and special assessments on members of the cooperative.[5] Section 61 of the bylaws provides in part:

---

5. Section 50 states:

 The Board of Directors shall, from time to time, fix and determine the sum or sums necessary and adequate for the continued ownership and operation of the project. They shall determine the amounts required for capital items, such as principal and interest payments, on any mortgage and any outstanding debenture indebtedness, and for operating items, such as taxes, insurance, repairs, betterments and op-

erating expenses. The total monthly requirements, though separately determined as to capital and operating items shall be assessed as a single sum against all subsisting and outstanding use contracts and prorated thereto based on the assigned capital cost of said contracts. Said assessments shall be payable monthly as ordered by the Board of Directors. Special assessments, should such be required, shall be levied and paid in the same manner as provid-

The right of occupancy under the use contract is, nevertheless, a matter of discretionary decision of the Board of Directors and every transfer to resident membership, with its right of occupancy as defined in the use contract, is subject to the approval of the Board of Directors.

Section 62, set forth above, conditions leasing and subleasing on the approval of the Board.

■ The question before us is whether the surcharge imposed by the Board extended beyond these broad powers and represented a breach of fiduciary duty owed to Mrs. Kelley. The Broadmoor argues that according to D.C.Code § 29–1141, this question must be resolved in accordance with the business judgment rule because it is a Delaware corporation. D.C.Code § 29–1141 (1991 repl.) reads in pertinent part:

A foreign corporation or association operating on a cooperative basis and complying with the applicable laws of the state wherein it is organized shall be entitled to do business in the District of Columbia as a foreign cooperative corporation or association, shall govern itself in accordance with its bylaws and the laws of the state wherein it is organized.

In *Snowden v. Benning Heights Co-op., Inc.*, 557 A.2d 151, 152 (D.C.1989), we said that the pertinent words of this statutory provision "appear unambiguous, and the legislative history indicates the clarity of the D.C. Council's intent." We went on to "hold that D.C.Code § 29–1141 allows a foreign cooperative to govern itself according to its bylaws

and the laws of the state where it was incorporated...." *Id.* at 154. The court addressed concerns of District residents who did not wish to be subjected to the law of another jurisdiction by stating that "cooperative members' rights are protected by the bylaws of the cooperative association and by the provisions of their occupancy agreements, each of which will be personally known to the member." *Id.* Accordingly, to the extent that we can determine it, Delaware law controls in resolving the issue concerning the imposition of a rental surcharge on an owner who leases her cooperative apartment.

The applicable Delaware statutory law appears to be the Delaware Unit Property Act (Del. C. § 25–2201 *et seq.*). Section 2209 of that law states:

Each unit owner shall comply with the code of regulations and with such rules governing the details of the use and operation of the property and the use of the common elements as may be in effect from time to time and with the covenants, conditions and restrictions set forth in the declaration or in the deed to his unit or in the declaration plan.

Section 25–2202(2) defines "code of regulations" as "such governing regulations as are adopted pursuant to this chapter for the regulation and management of the property, including such amendments thereof as may be adopted from time to time." The term "code of regulations" appears to cover the bylaws of the cooperative.[6] Under the Dela-

---

ed above for regular monthly assessments. Apartments owned by the Corporation shall be assessed for accounting and rent application purposes in like manner as apartments owned by members of the Corporation. The Board may impose a late fee on any installment of a member's assessment that is not paid when due.

6. Section 25–2208 of the Delaware law details what the code of regulations must cover. The items listed generally are found in bylaws. They include: the method of calling meetings of unit owners and meetings of the council; the duties of each officer of the council; "maintenance, repair and replacement of the common elements and payment of the cost thereof"; "the manner of collecting common expenses from unit owners"; and the method by which the governing rules for the use and operation of the property

and its common elements may be amended. Section 25–2202 defines the "council" as "a board of natural individuals ... all of whom shall be residents of this State or unit owners, ... and who shall manage the business operation and affairs of the property on behalf of the unit owners...." Section 25–2211 delineates the duties of the council or board as follows:

(1) The maintenance, repair and replacement of the common elements; (2) The assessment and collection of funds from unit owners for common expenses and the payment of such common expenses; (3) The adoption and amendment of the code of regulations and the promulgation, distribution and enforcement of rules governing the details of the use and operation of the property and the use of the common elements, subject to the right of a majority of the unit owners to change any

ware law, we look first to the bylaws to determine the validity of the Board's actions. In *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del.1983), the Delaware Supreme Court said that:

> [I]f the bylaw is unambiguous in its language, we do not proceed to interpret it or to search for the parties' intent behind the bylaw.... We only construe the bylaw as it is written, and we give language which is clear, simple, and unambiguous the force and effect required.... Words and phrases used in a bylaw are to be given their commonly accepted meaning unless the context clearly requires a different one or unless legal phrases having a special meaning are used.

(Citations omitted). Under the Broadmoor bylaws, actions taken by the Board must be "lawful" and "appropriate." Section 21 of the bylaws empowers the Board to "do all such lawful acts and things as are by statute, Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members." Section 47 authorizes the Board to make "appropriate rules and regulations controlling use of apartments...."

The meaning of the word "appropriate" as used in the bylaws may be determined by reference to § 8(7) of the contract, in which the Broadmoor agrees "generally, to do and perform all other acts reasonably required to insure the sound operation of the Co-operative and to protect the investment of its members." In the context of the contract and bylaws, "appropriate" means "reasonable." Hence, we review the surcharge imposed on rentals to determine whether it is reasonable. In that regard, we are bound by the record before us and the arguments preserved in the trial court.

Mrs. Kelley argues that the surcharge was not only unreasonable but also subjective and discriminatory. She suggests events that could result from the surcharge, including: non-competitive rental rates, forced sales, adverse tax consequences, and adverse impact on State Department and other government personnel who spend tours of duty overseas. The problem with Mrs. Kelley's position is that it is based on conjecture and speculation. She presented no affidavits to indicate that such events were probable. Nor did she present any affidavit or Board minutes to rebut the affidavit of Sandra McFeeley, Esq., President of the Board.

Ms. McFeeley's affidavit addressed the purpose of the surcharge and why it was necessary to "protect the investment of [the Broadmoor's] members." *See* § 8(7) of the contract. The surcharge is designed to promote owner occupancy. One of the ways to accomplish this objective "is to discourage the use of individual units as rental investment property." Moreover, new owner occupancy depends on the ability of prospective owners to secure proper financing. Ms. McFeeley's affidavit explained the difficulty of securing a Federal National Mortgage Association (Fannie Mae) mortgage if twenty to thirty percent of the apartments were rental units. It also stated that Broadmoor would not be eligible for Fannie Mae financing if more than thirty percent of the units were rented. To her affidavit was attached a copy of a Fannie Mae document containing some of its regulations. Finally, the affidavit explained that if less than fifty percent of the Broadmoor apartments are not "used as a primary residence, the Association loses all of the available homestead exception, and receives no credit whatsoever for not using municipal trash collection." [7]

Mrs. Kelley suggests that "[o]lder people and handicapped people are most likely to suffer the adverse impact of the surcharge regulation." We have previously recognized that a regulation may be unreasonable if it has "an unfair or disproportionate impact on only certain unit owners." *Johnson v. Hobson*, 505 A.2d 1313, 1318 (D.C.1986). However, there is no evidence in the record to indicate that the surcharge has a disproportionate impact on older people or the handicapped, or is unfair to them.

---

such actions; and (4) Any other duties which may be set forth in the declaration or code of regulations.

**7.** The homestead exemption and the private trash collection credit are used to reduce property taxes.

In a similar vein, Mrs. Kelley argues that one class of owners (owners/occupants) has imposed a regulation "which discriminates financially" against another class (owners/renters), and that the Board's action is unreasonable under *Thanasoulis v. Winston Towers 200 Ass'n., Inc.*, 110 N.J. 650, 542 A.2d 900 (1988).[8] *Thanasoulis* is inapposite because it involved a charge affecting "common elements" of the association, and its imposition was directly governed by a specific provision in the condominium's master deed, as well as a provision of the New Jersey Condominium Act. Here the rental surcharge does not affect common elements and there is nothing in the contract or by-laws which directly addresses a surcharge.

Mrs. Kelley also maintains that the rental surcharge to which she is being subjected would be $400 in the first year and $2,000 by the fifth year, and that she would be subsidizing those who own and occupy their apartments. She has presented no affidavits substantiating these conclusory statements.[9]

On the record before us we cannot say that a $5 or $25 monthly rental surcharge is unreasonable, subjective or discriminatory. Therefore, we affirm the trial court's orders of June 1 and June 30, 1995. As a matter of law, the Broadmoor was entitled to summary judgment on the issues presented.

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

8. *Thanasoulis* involved a different monthly parking charge for resident and non-resident condominium owners. The New Jersey Supreme Court concluded that the differential charge violated the terms of the New Jersey Condominium Act and the provision in the master deed relating to parking and garage facilities.

9. Mrs. Kelley made no argument in the trial court that the surcharge constituted a special assessment under § 50 of the bylaws, and that it was not "levied and paid in the same manner as provided ... for regular monthly assessments," as required by § 50.