Richard A. BURGESS Jr., Appellant,

v.

G. Raymond PELKEY,
et al., Appellees.

No. 97–CV–1473.

District of Columbia Court of Appeals.

Argued Jan. 12, 1999.
Decided Sept. 30, 1999.

Richard A. Burgess Jr., pro se.

Michael P. Broderick, Silver Spring, for appellees.

Before STEADMAN, FARRELL and RUIZ, Associate Judges.

RUIZ, Associate Judge:

Appellant Richard A. Burgess, Jr., challenges the trial court's decision to dismiss his lawsuit on summary judgment, asserting that material facts remained in dispute regarding, *inter alia*, whether the Board of Directors of appellee Square 3324 Hampshire Gardens Apartments (Hampshire Gardens),[1] a cooperative association,

1. Appellee G. Raymond Pelkey is the chairman of the board of directors for Hampshire Gardens. Mr. Pelkey was added to this lawsuit in his capacity as chairman by appellant's amended complaint filed March 8, 1995, and was originally dismissed from this suit by the trial court's first grant of summary judgment. However, Mr. Pelkey was restored as a codefendant in this case by this court's decision in *Burgess v. Square 3324 Hampshire Gardens Apartments, Inc.*, 691 A.2d 1153 (D.C.1997) (*Burgess I* ), which reinstated Burgess' breach

was in breach of contract when it enforced amendments to the cooperative's bylaws and house rules which affected certain rights and benefits previously held by appellant when he originally purchased a share in the cooperative. We affirm.

## I.

The proprietary lease which Burgess, as lessee, entered into with Hampshire Gardens in 1974 [2] permitted the lessee to sublet the apartment upon the approval of the cooperative's Board of Directors.[3] Burgess never personally occupied his one bedroom apartment, and instead, subleased it to a series of tenants from the date of purchase until September 1989. In October 1981, the Board amended the bylaws to require that seventy-five percent of the apartments be occupied by their owners.[4] In October 1983, the Board again raised the owner-occupancy requirement, this time to ninety percent. However, the 1983 amendment also provided that the Board could "exercise its discretion" and waive the ninety percent occupancy requirement "if it so deems to be necessary." Burgess did not object to any of these amendments and, in fact, did not become aware of them until on or about November 13, 1984, when Burgess received a letter informing him that if his apartment became vacant he would have to sell the unit "because the Board will no longer approve new subleases."

Burgess' last tenant moved out on September 30, 1989, and Burgess put his unit up for sale in March 1990 after being informed by Board members that, as stated in the November 1984 letter, new subleases would no longer be approved. During the spring of 1990, workers repairing the unit damaged the interior of the apartment. The unit was not sold until February 7, 1992, and as a condition for settlement, Burgess was also required to pay Hampshire Gardens $4,575.26 in past due maintenance fees. Burgess subsequently filed a complaint against Hampshire Gardens on February 6, 1995, alleging principally that Hampshire Gardens' 1981 and 1983 amendments to its bylaws breached the terms of his proprietary lease by preventing him from subletting his apartment. Burgess also sought damages for Hampshire Gardens' negligent repair of his apartment during the spring of 1990.

The trial court initially dismissed the suit on summary judgment, holding that Burgess' claims had been barred by the three-year statute of limitations for negligence and contract actions, D.C.Code Ann. § 12–301 (1981). We reinstated Burgess' contract claims in *Burgess I*, holding that the proprietary lease qualified as an instrument under seal, and that accordingly, the twelve-year statute of limitations was applicable. *See Burgess I, supra* note 1, 691 A.2d at 1157. Burgess did not, however, challenge the trial court's dismissal of his negligence claim on appeal. *See id.* at 1154 n. 1. On remand, the trial court again dismissed Burgess' remaining contract claims on summary judgment, relying substantially on Hampshire Gardens' motion.

of contract claims that are the subject of this appeal.

2. The lease was for a term commencing April 1, 1974, and ending on December 31, 2029.

3. Section 49 of the Hampshire Gardens bylaws also required that all unit owners who wished to sublet their apartments submit to the Board of Directors written applications. In addition, at the time Burgess bought his unit, Section 47(2) of the by-laws further provided that:

[s]hould a stockholder be denied a proprietary lease to a given apartment to which his unit of stock had theretofore been allocated, or denied the right to let or sub-let said apartment, the Board shall be required to make every reasonable effort to rent said apartment at a fair and reasonable rental for the account of said stockholder, without charge for collection.

This last provision was later deleted by Board action. See *infra* note 4.

4. Also sometime in 1981, the Board amended the bylaws to delete paragraph 2 of Section 47. See *supra* note 3.

## II.

We review a motion for summary judgment by assessing the record independently and viewing it in the light most favorable to the non-moving party. *See Kelley v. Broadmoor Co-op. Apartments*, 676 A.2d 453, 456 (D.C.1996) (citing *Walton v. District of Columbia*, 670 A.2d 1346, 1353 (D.C.1996)). The trial court's grant of summary judgment will be affirmed if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983) (quoting Super. Ct. Civ. R. 56(c)).

### A. Claim 1—Entitlement to damages for negligent repairs.

■ Although the majority of Burgess' breach of contract claims are premised upon the alleged damage to his original ownership rights as caused by the Board's subsequent changes to the bylaws and house rules, Burgess also contends that he is entitled to reimbursement of expenses paid to repair the damages to his apartment caused by negligent Hampshire Gardens workers. In his original complaint, Burgess sought these damages both under a negligence cause of action as well as under a breach of contract claim. Although the trial court originally ruled that his negligence claim was barred by the three-year statute of limitations for such claims, D.C.Code Ann. § 12–301(3) (1981), which Burgess did not appeal, he now reasserts his entitlement to damages for the negligent repair under the breach of contract claim, relying on Article 4 of the proprietary lease which provides that Hampshire Gardens shall be liable for losses or damages caused to a lessee's unit if

the damage "shall have been caused by negligence on the part of the lessor."[5] We reject appellant's argument because we conclude that his breach of contract claim for damages caused by negligent repair is "completely dependent upon and intertwined with" his negligence claim for the same injury. *Morton v. Nat'l Med. Enter., Inc.*, 725 A.2d 462, 471 (D.C.1999).

■ "It is well settled that in a determination of the applicable statute of limitations, the plaintiff's characterization of the claim is not controlling," *Saunders v. Nemati*, 580 A.2d 660, 661 (D.C.1990), and "we must look beyond the conclusory terms of the pleadings to the substantive elements of any alleged causes of action." *McCracken v. Walls–Kaufman*, 717 A.2d 346, 350 (D.C.1998). In other words, the fact that Burgess now seeks damages for Hampshire Gardens' faulty repair of his premises under a breach of contract theory is not by itself dispositive of the statute of limitations issue. While Article 4 of the proprietary lease does provide that Hampshire Gardens shall be liable for losses or damages caused to the lessee's unit if the damage "shall have been caused by negligence on the part of the lessor," the provision does not impose a new duty on the part of Hampshire Gardens as it already had a common-law obligation to perform any repairs it might make on the property in a non-negligent manner.[6] *Cf. Etheredge v. District of Columbia*, 635 A.2d 908, 918 (D.C.1993) (same course of conduct may support both a claim of assault and battery and a negligence claim as long as the defendant, while engaging in the conduct that included the intentional tort, was also in breach of another recognized duty owed to the plaintiff). *See also Walls–Kauf-*

---

**5.** Given our disposition of the negligence claim, we need not address Hampshire Gardens' alternative arguments based on the doctrines of *res judicata* and law of the case.

**6.** Article 4 imposes a duty on the cooperative to keep the apartment building and grounds in good repair, but provides that in doing so, the cooperative "shall not be liable for ...

any loss, cost, damage or injury which may be sustained by the Lessee, the members of his family, guests, invitees, servants or agents unless the same shall have been caused by negligence on the part of the Lessor." In this sense, the clause has the characteristics of a limitation on liability rather than an assumption thereof.

*man,* 717 A.2d at 351 (same). Thus, although Burgess' claim also may be presented as a breach of contract cause of action, it is nevertheless Hampshire Gardens' underlying negligence which is the basis for the alleged breach of contract. *See id.* at 350. Accordingly, Burgess may not circumvent the three-year statute of limitations for a negligence action by seeking damages for the identical injury under a breach of contract claim. *See Saunders,* 580 A.2d at 661 ("The action thus pleaded cannot ... be removed from its place in the law of torts by calling what occurred also [a breach of contract].") (quoting *Morfessis v. Baum,* 108 U.S.App. D.C. 303, 305, 281 F.2d 938, 940 (1960)).

### B. All other claims.

■ Burgess' remaining claims all stem from the Board's decisions from 1981 to 1983 to amend its bylaws and house rules. Burgess contends that in amending the bylaws to require a higher unit occupancy rate by shareholders, the Board breached the terms of his proprietary lease because the new bylaws prevented him from subletting his condominium unit, a right which he originally enjoyed when he purchased his share in the cooperative. Although Burgess does not challenge the procedures followed by the Board in enacting the amendments, he relies on language in Sections 50 and 51 of the bylaws which provide collectively that no house rules or regulations nor bylaws shall be made "retroactive." [7] Accordingly, Burgess contends that the Board should not have refused to permit him to sublet his apartment or, once it did so, that it was required by pre-amendment Section 47(2) to make "reasonable efforts" to rent the apartment out on his behalf. In declining to do either, Burgess argues that the Board was in breach of contract.[8] Under Hampshire Gardens' interpretation of the meaning of the term "retroactive," however, the changes in the rules and bylaws did not violate either Section 50 or 51 of the bylaws because existing subtenants were not asked to vacate their apartments until their subleases had expired, and hence, the amendments were applied prospectively to future efforts to sublease, with notice of the restriction. We agree with Hampshire Gardens' interpretation and reject appellant's argument.

■ The cooperative instruments, which include the bylaws and sales agreement, constitute a contract governing the legal relationship between the cooperative association and the unit owners. *See Johnson v. Fairfax Village Condo. IV Unit Owners Ass'n,* 548 A.2d 87, 91 (D.C.1988); 15A Am. Jur. 2d *Condominium and Co–Operative Apartments* § 79 (1976). A purchaser of a unit in a condominium [9]

7. Section 50 provides:
   The Board of Directors shall have and exercise the power to prescribe and publish rules and regulations for the government and management of the corporate property, and to alter, amend, repeal or add to the same, from time to time, and any change in said rules and regulations shall be published at least five (5) days before the date when such change shall take effect, provided always, that *no rules or regulations shall be made retroactive.*
   (Emphasis added.)
   Section 51 states in pertinent part:
   In all cases where by-laws are changed by the Board, notice of such change shall be sent to each stockholder at least fifteen (15) days before the date when such change shall take effect, provided always, that *no change in these by-laws* made by the stockholders or the Board of Directors *shall be retroactive.*
   (Emphasis added.)

8. Burgess also challenges the Board's amendment of a house rule to restrict transfer of the right to occupy an apartment for two years from the date of acquiring such right on the ground that such restriction impairs the value of his interest in the cooperative.

9. A condominium differs from a cooperative in that a condominium owner has "a fee interest in the apartment where he or she resides" whereas "[a] cooperative property owner holds shares of stock in the cooperative corporation that owns the apartment." *Lemp v. Keto,* 678 A.2d 1010, 1018 (D.C.1996). The corporation leases apartments to its stockholders.

voluntarily submits himself to the condominium form of property ownership, which requires each owner to "give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization." *Worthinglen Condominium Unit Owners' Ass'n v. Brown*, 57 Ohio App.3d 73, 566 N.E.2d 1275, 1277 (1989) (quoting *Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180, 181–82 (Fla.Dist.Ct.App.1975)); *see also Johnson v. Hobson*, 505 A.2d 1313, 1317 (D.C.1986). "Potential purchasers of condominium units should thus realize that the regime in existence at the time of purchase may not continue indefinitely and that changes in the declaration may take the form of restrictions on the unit owner's use of his property." *Worthinglen Condominium Unit Owners' Ass'n*, 566 N.E.2d at 1277. As the cooperative form of ownership is more restrictive than that of a condominium,[10] it follows that a stockholder in a cooperative is no less subject to the private regime established by the association.

■ Although neither the courts in the District of Columbia nor Delaware, Hampshire Gardens' place of incorporation,[11]

have ruled on whether an amendment to a cooperative or condominium instrument that restricts the occupancy or leasing of units in the cooperative or condominium complex can be applied to owners who bought their shares or units before the amendment was adopted, most courts deciding the issue have held that such amendments, once properly adopted, are indeed binding upon earlier buyers. *See Ritchey v. Villa Nueva Condominium Ass'n*, 81 Cal.App.3d 688, 146 Cal.Rptr. 695, 699 (1978); *Flagler Fed. Sav. and Loan Ass'n v. Crestview Towers Condominium Ass'n*, 595 So.2d 198, 200 (Fla. Dist.Ct.App.1992) (amendment to recorded Declaration of Condominium); *Breezy Point Holiday Harbor Lodge—Beachside Apartment Owners' Ass'n v. B.P. Partnership*, 531 N.W.2d 917, 920 (Minn.Ct.App. 1995); *McElveen–Hunter v. Fountain Manor Ass'n*, 96 N.C.App. 627, 386 S.E.2d 435, 436 (1989); *Worthinglen Condominium Unit Owners' Ass'n*, 566 N.E.2d at 1279; *Bd. of Dir. of By the Sea Council of Co-Owners, Inc. v. Sondock*, 644 S.W.2d 774, 781 (Tex.App.1982); *Shorewood West Condominium Ass'n v. Sadri*, 92 Wash. App. 752, 966 P.2d 372, 376 (1998). *But see Winston Towers 200 Ass'n, v. Saverio*, 360 So.2d 470, 470–71 (Fla.Dist.Ct.App. 1978) (amendment to condominium association bylaws); *Breene v. Plaza Tower Ass'n*, 310 N.W.2d 730, 735 (N.D.1981).[12]

**10.** *See generally* 15A AM. JUR. 2D *Condominiums and Co-Operative Apartments, supra*, at § 5; 8 RICHARD R. POWELL & PATRICK J. ROHAN, POWELL ON REAL PROPERTY § 54A.01[6], at 54A–17 to 54A–18 (1999).

**11.** In addition to being bound by the regime established in the cooperative's instruments, shareholders are subject to the law of the state under which the corporation is formed. *See Kelley*, 676 A.2d at 459 (citing D.C.Code Ann. § 29–1141 (1981)). The Delaware statutory law provides that "[e]ach unit owner shall comply with the code of regulations and with such rules governing the details of the use and operation of the property … *as may be in effect from time to time*." Del.Code Ann. tit. 25, § 2209 (1998) (emphasis added).

**12.** Burgess relies on *Breene* for his proposition that an amendment to a condominium

declaration which prohibited the sublease of a unit to a nonowner except in specific situations cannot be applied retroactively to individuals who had purchased their units prior to the amendment. However, in *Breene*, the Supreme Court of North Dakota was bound by a state statute which required that the declaration of condominium, use restrictions and bylaws be first recorded in the office of the register of deeds in order for them to be effective as against prospective buyers. See Breene, 310 N.W.2d at 733–34. Neither D.C. nor Delaware has a similar statutory provision. *Cf. Townhouse III Condominium Ass'n v. Mulligan*, No. CV–92–50183–S, 1995 WL 118739 at *3, 1995 Conn.Super. LEXIS 749, at *12 (Conn.Super.Ct. March 13, 1995) (holding that it would not follow *Breene* because Connecticut does not have a similar statutory provision). *See also Worthinglen*

We adopt this view. To hold otherwise would negate uniformity, a principal purpose of cooperative and condominium living arrangements, by creating disparity among units subjected to differing regulatory regimes. *See Worthinglen Condominium Unit Owners' Ass'n*, 566 N.E.2d at 1279 (noting that a principal purpose of condominium rules and regulations is to create uniform living conditions for unit owners). The potential for gross disparity in regulatory regimes over an extended period of time is underscored in this case where Burgess originally signed a proprietary lease which entitled him to the right of occupancy of his unit until December 31, 2029. Thus, under Burgess' interpretation of the term "retroactive," Hampshire Gardens would not be able to apply any amendments adopted subsequent to his entry into the cooperative until his lease expired in 2029. Such a result would create an undesirable Balkanization of regulatory regimes among the different units within the same cooperative community. We emphasize again that the amendments adopted limited only the right to sublease in the future and did not affect existing subleases.

■ We also are satisfied that Burgess had sufficient notice before he bought his stock in the cooperative that he would be bound by subsequent changes to the cooperative instruments. *See McElveen–Hunter*, 386 S.E.2d at 436. Burgess' origi-

nal application at the time he purchased his cooperative share provided in paragraph 8 that Burgess agreed to "abide by and conform with the By–Laws, House rules and regulations *in force during the occupancy*." (Emphasis added). In addition, paragraph 26 of the proprietary lease stated that the lease was subject to:

> the provisions of the certificate of incorporation, the by-laws (*now existing or hereafter adopted*) and the rules and regulations (*now existing or hereafter established*) of the Lessor Corporation.

(Emphasis added.) Finally, Article 11(E) of the Certificate of Incorporation provides that all certificates of stock issued by Hampshire Gardens would be subject to the Certificate's provisions as well as any bylaws "now existing and hereafter adopted" by the cooperative. *See also* Del. Code Ann. tit. 25, § 2209, *supra* note 11. It is therefore clear that Burgess was on notice at the time of purchase of the possibility that his rights in the cooperative could be affected by subsequent changes in the cooperative's bylaws and house rules.

■ Thus, provided that the amended bylaws were enacted according to proper procedures, the grant of summary judgment by the trial court is appropriate so long as the rules come within the authority of the Board as provided in the cooperative's governing instruments. *See Kelley*, 676 A.2d at 459; [13] *Johnson*, 505 A.2d at

---

Condominium Owners' Ass'n, 566 N.E.2d at 1279 n. 3 (rejecting *Breene* even though "Ohio's condominium statutes, like North Dakota's, require condominium owners to record property restrictions").

**13.** In *Kelley*, we looked to Delaware law and applied the "business judgment rule" to determine the validity of a Board's action where the cooperative was incorporated in the state of Delaware, as Hampshire Gardens is in this case. We noted that under Delaware law, "we look first to the bylaws to determine the validity of the Board's actions." *See Kelley*, 676 A.2d at 459 (citing *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del.1983)). In interpreting bylaws which required the Board's actions to be "lawful" and "appropriate," we stated that in the context of the

cooperative contract and bylaws, "appropriate" meant "reasonable" and accordingly reviewed a surcharge imposed on rentals to determine whether it was "reasonable." Here, the Board of Directors for Hampshire Gardens was similarly authorized to take any action "which the Board in its discretion shall deem needful, advisable or proper for the preservation, management, conduct and operation of the property, affairs and business of the Corporation, and to make and enforce all needful rules and regulations for that purpose." We need not explore further any subtleties of interpretation and deference that might relate to the business judgment rule and the grant of discretion to the Board to determine the need, advisability or propriety of particular by-laws.

1317. Burgess does not challenge the procedures pursuant to which the amendments were adopted, nor does he generally contend that, in adopting the requirement of owner occupancy, the Board acted without authority. Rather, Burgess' complaint is that the requirement should not have applied in his case. In its motion for summary judgment, Hampshire Gardens provided an affidavit from Mr. Raymond Pelkey, the Chairman of the Board of Directors of Hampshire Gardens, explaining the purposes of the stricter unit occupancy bylaws:

> First and foremost, it was the Board's judgment that the mutual and cooperative objects of the corporation were best served if the apartments were occupied by shareholders of the corporation rather than by subtenants. This was deemed to be in the best interests of the shareholders. Further, in order to qualify for advantageous property tax credits, a bare minimum of at least 50% of the apartments were required under D.C. law to be occupied by shareholders. Even this bare minimum was too low, however, to satisfy the lending criteria of financial institutions who placed loans for both the cooperative and the purchase of individual units. These lenders will not extend financing if less than 70% to 80% of the units are owner-occupied.

Burgess has not presented any affidavits or Board minutes either rebutting Pelkey's representation or substantiating Burgess' own broad allegations of "losses and damages from lost rents, repair costs, reduced property value from a forced sale, ... and charges improperly deducted from his sale proceeds at settlement." *See Kelley,* 676 A.2d at 461.

Under analogous circumstances in *Kelley,* we concluded that similar justifications proffered by the president of the cooperative's housing association provided a basis for a rental surcharge which the appellant failed to rebut with evidence of any particularized losses which she claimed to have suffered from the subjective and discriminatory imposition of the surcharge. *See id.* In this case, Burgess has not made an adequate showing that the cooperative's rules have "an unfair or disproportionate impact on only certain unit owners." *Johnson,* 505 A.2d at 1318. Although he did present minutes from an April 16, 1984, board meeting showing that Pelkey had asked for and received permission to sublet a second apartment for as long as Pelkey continued to live in the complex, Burgess has not shown that he was unfairly treated because he never requested a waiver of the rule on his own behalf, and he never occupied a unit at Hampshire Gardens. Nor did Burgess ever raise any objections or express his concerns to the Board when it adopted the limitations on subletting. On the record before us, we cannot say that the Board's amendments to the bylaws and house rules changing the owner-occupancy requirement are unreasonable, subjective or discriminatory.[14] Therefore, as there are no material issues of fact in dispute and, as a matter of law, Hampshire Gardens is entitled to summary judgment on the issues presented,[15] we affirm the judgment of the trial court.

*Affirmed.*

---

**14.** Nor is the Board's amendment to the house rules imposing a two-year residency requirement on prospective owners from the date of sale unreasonable. See *supra* note 8.

**15.** Because we have decided that Hampshire Gardens did not breach its contract with Burgess, it follows that Burgess was not entitled to reimbursement of his maintenance fees.

Nor was the Board's "forced" sale improper, as under Section 40(D) of the bylaws, the Board is entitled to demand and receive a stockholder's certificate of stock which may be subsequently sold in the event that the stockholder is more than 20 days in default of fees owed.