**ST. JAMES MUTUAL HOMES,**
Appellant,

v.

**Tracy N. ANDRADE, Appellee.**

**No. 01–CV–1371.**

District of Columbia Court of Appeals.

Submitted Nov. 19, 2002.

Decided July 3, 2008.

Elizabeth Figueroa, Washington, DC, was on the brief for appellant.

Tracy N. Andrade filed a brief pro se.

Before FERREN, STEADMAN, and TERRY, Senior Judges.*

TERRY, Senior Judge:

This appeal arises from a dispute between St. James Mutual Homes ("St. James"), a cooperative housing corporation, and Tracy Andrade, one of its former members. After a non-jury trial, the court awarded Mr. Andrade the return of what the parties have referred to as "membership monies," which are the initial payments made to St. James when someone becomes a member of the cooperative, plus

---

* Judge Steadman was an Associate Judge of the court at the time this case was submitted. His status changed to Senior Judge on October 18, 2004.

Judge Terry was an Associate Judge of the court at the time this case was submitted. His status changed to Senior Judge on February 1, 2006.

interest and court costs.[1] The trial court also denied St. James' counterclaim for unpaid "carrying costs"—*i.e.*, the monthly payments a member makes to the cooperative. St. James argues on appeal (1) that the court erred in ruling that Mr. Andrade's claim for the return of his membership monies was not barred by the statute of limitations; and (2) that the court's denial of its counterclaim for unpaid carrying costs was based on an erroneous interpretation of the Occupancy Agreement. We affirm the judgment on Mr. Andrade's claim and hold that it was not barred by the statute of limitations, but on a ground different from that relied upon by the trial court. With respect to St. James' counterclaim, we reverse the judgment and remand the case for further proceedings.

I

St. James is a corporation that owns and maintains a cooperative apartment building in the District of Columbia. In 1994 Mr. Andrade purchased a membership in St. James which entitled him to occupy a dwelling unit in that building for a three-year term, from June 1, 1994, through May 31, 1997. Admitted into evidence at trial was the Occupancy Agreement, which set forth the terms and conditions of Mr. Andrade's membership. Article 4 of the agreement states that when the three-year term expires, the membership will be automatically renewed for another three years unless "notice of the Member's election not to renew shall have been given to the Corporation in writing at least four months

prior to the expiration of the then current term."

On July 22, 1997, almost two months *after* the initial three-year term ended, Mr. Andrade submitted a letter to Ms. Brown–Lee, the president of the Board of Directors, informing her that he would be moving out of his dwelling unit on August 31. He said the same thing in another letter, also dated July 22, 1997, to Mr. Lytle, the property manager of the building. Both letters were introduced into evidence. Mr. Andrade did in fact move out of his unit on August 31, 1997. According to his testimony, his decision to move was "willingly accepted" by both of these individuals.[2]

St. James was not able to resell Mr. Andrade's dwelling unit until October of 1999, more than two years after he moved out. At no time between Mr. Andrade's departure and the resale of the unit did he pay any carrying costs, nor did St. James notify him of its intent to hold him accountable for any unpaid carrying costs. St. James did not return Mr. Andrade's membership monies, either when he moved out or when the unit was resold in October 1999, despite his repeated requests for St. James to do so.

On January 18, 2001, Mr. Andrade filed this action for the return of his membership monies. On March 15, 2001, the day of the trial, St. James filed a counterclaim for $7,525, seeking Mr. Andrade's unpaid carrying costs for the period from Septem-

---

1. For Mr. Andrade, this sum included: (1) $2,646 for an initial equity payment (which grew to $3,618 by October of 1999 when his unit was resold); (2) $445 for what the by-laws call the "Value of the Occupancy Agreement"; and (3) the "subscription price" of his membership in the cooperative, which was $55.

2. Mr. Andrade testified that sometime around the middle of July, he asked Ms. Brown–Lee what he would need to do in order to move out without any further obligations, and that "she made it known to me that I would need to submit in writing my intention to move out thirty days in advance of my actual move-out date."

ber 1, 1997, through October 31, 1999.[3]

## II

An action for breach of contract must be brought within three years from the date of the breach. D.C.Code § 12–301(7) (2001); *see Western Union Telegraph Co. v. Massman Construction Co.*, 402 A.2d 1275, 1277–1278 (D.C.1979). The trial court concluded that a breach occurred, and that Mr. Andrade's cause of action accrued, when St. James failed to return his membership monies when he moved out of the building. That event occurred in August 1997, more than three years before he filed this suit in January 2001. The court nevertheless held that Mr. Andrade's claim was not barred by the statute of limitations because "the corporation led him to believe that the sums would be returned upon the sale of the unit governed by his Occupancy Agreement," thus ruling in effect that Mr. Andrade was lulled into not filing a timely suit, and that St. James was therefore estopped from raising a statute of limitations defense. We hold that the trial court erred in ruling that Mr. Andrade's cause of action accrued in August 1997, but we also find that error harmless because we conclude that the cause of action did not accrue until October 1999. We therefore must sustain the trial court's decision that the suit is not barred by the statute of limitations. *See*, *e.g.*, *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 775 (D.C.1998) ("if the decision of a trial court is correct, 'it must be affirmed,' even though the trial court 'relied upon a wrong ground or gave a wrong reason' " (citation omitted)).

"What constitutes the accrual of a cause of action is a question of law...." *Id.* at 770–771 (citations omitted); *accord*, *e.g.*, *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 735 (D.C. 2000) (citations omitted). Here we are dealing with a breach of contract claim, and therefore we must decide what triggered St. James' obligation to return Mr. Andrade's membership monies. The trial court ruled that St. James incurred this obligation when Mr. Andrade moved out. We hold, however, that his cause of action did not accrue until St. James failed to return the membership monies upon the resale of the dwelling unit in October 1999.

Admittedly, the Occupancy Agreement says nothing about the return of membership monies, and the by-laws—which give St. James in Section 8(b) a thirty-day "option," but "not [an] obligation," to buy back the membership from any member who decides to leave, subject to deductions for any necessary repairs and deferred maintenance [4]—are silent as to *when* such monies must be returned.[5]

---

**3.** David Williams, the property manager at the time of trial, admitted in his testimony that a co-op member who moves out is entitled to the return of membership monies as long as the member is "in good standing" and the dwelling unit is left "in good condition." St. James withheld this money because it believed Mr. Andrade to be in arrears for carrying costs in an amount greater than what was owed to him. It initially opted not to sue him for the unpaid carrying costs because it would have cost more to litigate the matter than it could have recovered. When he filed suit for his withheld membership monies, however, St. James apparently decided to file, and did file, a counterclaim for the carrying costs.

**4.** St. James has not denied that it owed Mr. Andrade a refund of his membership monies; rather, it asserted that Mr. Andrade owed it a greater amount for carrying costs. See note 3, *supra*.

**5.** The trial court, in reaching its decision, refused to consider the cooperative's by-laws because Mr. Andrade testified that St. James had never delivered a copy of the by-laws to him, as required by Article 14 of the Occu-

Our holding is therefore based not on the agreement itself, but on documentary evidence outside of the agreement, namely, the Settlement Statement received by Mr. Andrade upon purchasing his unit. This document, which was admitted into evidence at trial, plainly states in capital letters in the lower right-hand corner, under the heading "Seller's Repayment Agreement Stipulations," the following: "NOTE: SELLER MAY ONLY RECEIVE FUNDS AS THEY ARE PAID TO THE RESALE ACCOUNT BY PURCHASER."

The unmistakable implication of this language, apparently overlooked by the trial court, is that membership monies are not to be returned to a departing cooperative member until another purchaser for that member's unit is found. And because a buyer was not found until October 1999, Mr. Andrade's cause of action did not accrue until that time. Since he filed suit within three years from that event, we hold that his claim was not barred by the three-year statute of limitations.

■■■ While relying on a document external to the Occupancy Agreement may raise concerns about parol evidence issues, the trial court held, and we agree, that in this case the parol evidence rule did not bar consideration of evidence outside of the agreement because the agreement was not completely integrated. In general, "[e]xtrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of [the] written contract must be excluded." *Fistere, Inc. v. Helz,* 226 A.2d 578, 580 (D.C.1967). Parol evidence may be relied upon, however, "to prove a contemporaneous agreement in addition to and not inconsistent with . . . the written agreement . . . where the parties did not adopt the writing as a statement of their whole agreement." *Boomhower, Inc. v. Lavine,* 151 F.Supp. 563, 567 (D.D.C. 1957) (citation omitted). Whether an agreement is completely or partially integrated depends on the intent of the parties at the time they entered into the agreement. *Howard University v. Good Food Services, Inc.,* 608 A.2d 116, 126 (D.C.1992) (citation omitted). "This intent must be sought . . . in the *conduct* and *language* of the parties and the *surrounding circumstances.* The document alone will not suffice." *Mitchell v. David,* 51 A.2d 375, 378 (D.C.1947) (citation omitted; emphasis in original); *accord, e.g., Ozerol v. Howard University,* 545 A.2d 638, 642 (D.C.1988). Other evidence relevant to the issue of whether a contract is completely integrated would include "[a]greements or negotiations prior to or contemporaneous with the adoption of a writing." *Good Food Services,* 608 A.2d at 127 (citation omitted).

■■ Here it is apparent that neither party intended the Occupancy Agreement

---

pancy Agreement. This ruling was erroneous because "[t]he cooperative instruments, which include the bylaws and sales agreement, constitute a contract governing the legal relationship between the cooperative association and the unit owners." *Burgess v. Pelkey,* 738 A.2d 783, 787 (D.C.1999) (citations omitted). Furthermore, even if Mr. Andrade never received the by-laws, the Occupancy Agreement makes several references to them, and thus he was on notice of their contents. Since under *Burgess* the by-laws are part of the contract, they are binding on Mr. Andrade even if he never read them. *See, e.g., Interdonato v. Interdonato,* 521 A.2d 1124, 1133 (D.C.1987) ("A person who signs a contract after having had an opportunity to read and understand it is bound by its provisions"); *Hollywood Credit Clothing Co. v. Gibson,* 188 A.2d 348, 349 (D.C.1963) ("It is, of course, the general rule that one who signs a contract has a duty to read it and is obligated according to its terms"); *Saylor v. Handley Motor Co.,* 169 A.2d 683, 685 (D.C.1961) ("one is obligated by his contract, though signed without knowledge of its terms").

to be completely integrated.[6] The agreement is silent as to the return of the money, yet St. James has admitted all along that it had to be returned at some point. Moreover, the Settlement Statement to which we refer was received by Mr. Andrade on June 1, 1994, the same date on which he signed the Occupancy Agreement, and is therefore contemporaneous with that agreement—a strong indication that the Occupancy Agreement was not completely integrated. Finally, because the agreement and the by-laws are silent as to when the membership monies are to be returned, the Settlement Statement does not contradict anything that is contained in those writings.

For these reasons we conclude that the intent of the parties, as expressed in the Settlement Statement, was that St. James was not obliged to return Mr. Andrade's membership monies until it resold his unit and received payment from the new purchaser. It follows that St. James' statute of limitations defense must fail. In light of St. James' acknowledgment that it owed those monies to Mr. Andrade, we must affirm the judgment on his original claim.

### III

As for St. James' counterclaim, the trial court found Mr. Andrade's failure to pay the monthly carrying costs, between the time he vacated the dwelling unit and its resale, to be a violation of Article 13 of the Occupancy Agreement. It nevertheless denied the counterclaim because St. James "never gave Mr. Andrade notice that the agreement was at an end and it never gave him an opportunity to cure," as the court believed Article 13 to require. Although Article 13, like the agreement generally, is anything but a model of clarity, we are convinced that the trial court misread it.

Article 13 states in part:

If, at any time after the happening of [certain listed events, one of which is "a default by the Member in the performance of any of his obligations under this agreement"] the Corporation shall give to the Member notice that this agreement will expire at a date no less than ten (10) days thereafter, this agreement and all of the Member's rights under this agreement will expire on the date so fixed in such notice, unless in the meantime the default has been cured in a manner deemed satisfactory by the Corporation....

The court interpreted this provision as requiring St. James to give notice to any member who is in default of the agreement—by failing, for example, to pay sums due—that the agreement will terminate as of a certain date. Because St. James did not give such notice, the court ruled that it could not pursue its counterclaim. We hold, however, that Article 13 imposes no notice requirement on St. James; rather, it gives St. James the *option* to terminate the agreement, but St. James is under no obligation to exercise that option. Thus the fact that St. James did not notify Mr. Andrade that the agreement would expire on a specified date had no effect on St.

---

**6.** St. James argues that parol evidence should not be considered in determining the intent of the parties. It asserts in its brief that because the Occupancy Agreement contains an integration clause, it "was integrated and, therefore, superseded all oral agreements within its scope." It is true that the agreement contains an integration clause. Article 20 of the Occupancy Agreement states: "No representations other than those contained in this agreement, the Charter and the By–Laws of the Corporation shall be binding on the Corporation." But that language alone is not dispositive in a case such as this, in which the court must determine an issue (here, the timing of the obligation to return the money) on which the contract is silent.

James' right to pursue its counterclaim. In other words, Article 13 is irrelevant here.

 St. James also maintains that Mr. Andrade abandoned his dwelling unit by moving out after the agreement was automatically renewed for another three-year term.[7] In the event of wrongful abandonment, a landlord has the right "to allow the premises to remain vacant and hold the tenant [responsible] for the full rent...." *Hart v. Vermont Investment Limited Partnership*, 667 A.2d 578, 587 (D.C.1995); *accord, Friedman v. Thomas J. Fisher & Co.*, 88 A.2d 321, 323 (D.C. 1952); *see also Ostrow v. Smulkin*, 249 A.2d 520, 521 (D.C.1969) ("a tenant cannot escape his obligation to pay rent by a mere tender of possession to the landlord or by abandonment of possession").[8]

 The trial court's erroneous interpretation of Article 13 led it to focus solely on whether St. James gave Mr. Andrade notice rather than on whether he abandoned his unit. Consequently, the court failed to make certain essential find-ings of fact, and we must remand the case to enable it to do so. First, the court on remand must determine whether Mr. Andrade did in fact abandon his unit and, if so, whether St. James accepted that abandonment. *See Walsh v. Moore*, 141 A.2d 754, 755 (D.C.1958) ("Whether there is such a surrender and acceptance is generally a question of fact").[9] Second, if it finds there was such an acceptance, then, according to Mr. Andrade's testimony and the documents he introduced in evidence, the act of acceptance appears to have been done by either Ms. Brown–Lee, the former president of the Board, or Mr. Lytle, the former property manager. Therefore, the trial court must determine whether either of these individuals had the authority, actual or apparent, to accept Mr. Andrade's abandonment of his unit on behalf of St. James.[10]

Depending on its findings on these issues (and any others which may arise in the course of the remand proceedings), the court shall enter an appropriate judgment on St. James' counterclaim. Should St. James ultimately prevail on its counter-

7. "An abandonment occurs when a tenant leaves the premises vacant with the avowed intention not to be bound by his lease." *Simpson v. Lee*, 499 A.2d 889, 894 (D.C.1985) (citation omitted).

8. While it is not entirely accurate to refer to St. James as a landlord and Mr. Andrade as a tenant since this case involves a cooperative apartment building, this court has held that "the relationship between the operator of a cooperative apartment and a stockholder-tenant is one of landlord and tenant...." *Clydesdale, Inc. v. Wegener*, 372 A.2d 1013, 1015 (D.C.1977) (citations omitted). Moreover, Article 13 of the Occupancy Agreement specifically states that "[t]he Member [i.e., Mr. Andrade] expressly agrees that there exists under this Occupancy Agreement a landlord-tenant relationship" and that the corporation has available to it "such legal remedy or remedies as are available to a landlord for the breach or threatened breach under the law by a tenant of any provision of a lease or rental agreement."

9. If St. James accepted the abandonment, Mr. Andrade's obligation to pay carrying costs would be extinguished. *See Walsh*, 141 A.2d at 755 ("a surrender by the tenant and an unqualified acceptance by the landlord terminates the tenancy and relieves the tenant from further liability for rent").

10. "Apparent authority arises when a principal places an agent 'in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold.'" *Insurance Management of Washington, Inc. v. Eno & Howard Plumbing Corp.*, 348 A.2d 310, 312 (D.C.1975) (citation omitted). Whether an agent has apparent authority is a question of fact which must be proved by the party asserting it. *Management Partnership, Inc. v. Crumlin*, 423 A.2d 939, 941 (D.C.1980).

claim, we agree with the trial court that it would not be entitled to recover the full amount it sought ($7,525) because the statute of limitations would bar recovery of any sums owed by Mr. Andrade prior to March 15, 1998, three years before it filed the counterclaim.

## IV

The judgment on Mr. Andrade's original claim is affirmed. The judgment in Mr. Andrade's favor on St. James' counterclaim is reversed, and the case is remanded for further proceedings with respect to that counterclaim.

*Affirmed in part, reversed in part, and remanded for further proceedings.*