In re CROTON RIVER CLUB, INC., Debtor.

CROTON RIVER CLUB, INC., Plaintiff–Appellee,

v.

HALF MOON BAY HOMEOWNERS ASSOCIATION, INC.; Steven Blust; David Cohen; Mable Fischella; Stanley Teller; Brian Trainor; Andre Vanschaffen; Ed Zafrewski, Defendants–Appellants,

Federal Deposit Insurance Corporation, Defendant–Appellee.

No. 1554, Docket 93–5109.

United States Court of Appeals, Second Circuit.

Argued Aug. 10, 1994.

Decided April 14, 1995.

Barry Werbin, New York City, for defendants-appellants.

Barbara Balaber–Strauss, White Plains, NY, for plaintiff-appellee.

Before: WINTER and LEVAL, Circuit Judges, and BURNS,* District Judge.

WINTER, Circuit Judge:

Defendants appeal from Judge Goettel's affirmance of two decisions by Bankruptcy Judge Schwartzberg. The first decision granted partial summary judgment to plaintiff-appellee on the ground that the allocation of a portion of the budget of a homeowners' association to a marina was not protected by the business judgment rule. The second decision was entered after an evidentiary hearing and concluded that the allocation was unreasonable. The bankruptcy court then substituted a different allocation. We affirm, although we hold that the decision barring any change in the new allocation is no longer in force because the marina has been sold.

## BACKGROUND

Croton River Club, Inc. ("Croton") sponsored and developed a planned community named Half Moon Bay on the banks of the Hudson River. Croton planned to build 326 residential units within 13 buildings. The development's amenities were to include tennis courts, a restaurant, a public park, automobile parking, a swimming pool, a community building, a lagoon, and a marina with 300 boat slips. Croton intended to construct an infrastructure including an access road with

---

* The Honorable Ellen B. Burns, United States District Judge for the District of Connecticut, sitting by designation.

a bridge across the nearby Metro North railroad tracks, street lighting, a sewage pumping station, landscaping, a garbage processing center, a riverfront promenade, and a sound barrier along the Metro North tracks. The Half Moon Bay Homeowners Association, Inc. (the "Homeowners Association") is a New York non-profit corporation that oversees the common elements of the Half Moon Bay development.

On February 14, 1991, Croton filed for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.*, when construction of Half Moon Bay was still incomplete. Most of the infrastructure was in place, but only 120 residential units and 162 marina slips had been constructed. Croton had sold 71 of the residential units and the remaining 49 were still not entirely complete.

At issue in the present matter is the allocation of the project's budget to the marina. At various stages of the development of Half Moon Bay, the sponsor—Croton—set an allocation for the marina of 14.25% of designated line items that reflected services used by both the marina and the residential units.

In December 1990, a group of residential unit owners from the Half Moon Bay development (hereafter "homeowners") initiated a derivative action against Croton and others seeking declaratory and injunctive relief and $6 million in damages. The derivative action alleged a failure by Croton to fulfill the offering plan and a breach of fiduciary duty by the Board of Directors of the Homeowners Association.

In July 1991, Croton entered into a stipulation and settlement agreement (the "Settlement") with HMB Acquisition Corp. and the homeowners. The HMB Acquisition Corp. wanted to purchase several of the assets connected to the Half Moon Bay site, but the settlement of all disputes between Croton and the homeowners was a condition for closing the sale. The Settlement thus provided that

> the budgets set by the [Half Moon Bay Homeowners Association, Inc.], and the allocations under the control of the [Half Moon Bay Homeowners Association, Inc.] (including the allocation of expenses to the Marina parcel), shall be finally decided by a vote of the homeowner-in-residence members of the [Half Moon Bay Homeowners Association, Inc.] Board.

The Settlement also restricted use of the Half Moon Bay site by owners of marina slips. Subsequent to the Settlement, Croton sold the residential units and the partially developed land to HMB Acquisition Corp. This sale included neither the marina nor the parcel of land intended for the restaurant.

In December 1991, the Homeowners Association Board of Directors set allocations for the 1992 budget. As indicated in the portion of the Settlement quoted above, only the Board members who owned residential units were entitled to vote on the budget. The allocation to be paid by the owners of marina slips (the "Marina Allocation") was set at approximately $160,000, or 53% of an expanded list of line items. The Marina Allocation was a three-fold percentage increase in the amount of the allocation from previous years and over an eight-fold increase in the dollar amount of the allocation initially recommended by the managing agent for the Homeowners Association.

On May 21, 1992, Croton commenced an adversary proceeding on behalf of itself and all others similarly situated to invalidate the Marina Allocation. The bankruptcy judge held that the business judgment rule did not protect the Marina Allocation and ruled, after two days of evidentiary hearings, that the marina slip owners should pay an allocation based on a 14.25% multiplier (as they had in previous years) applied to an independently arrived at list of line items that, in the court's view, represented shared expenses.

Appellants appealed to the district court claiming that the bankruptcy court: (i) should have applied the business judgment rule to the allocation and (ii) erred in creating and enforcing its own allocation of expenses common to the marina slip owners and the residential unit owners.

The district court upheld the bankruptcy court, although the district court held that the bankruptcy court had not created its own allocation but had "simply struck down the 53% allocation which automatically reinstated the 14.25% figure." Therefore, the district

court believed that it "need not reach whether or not Judge Schwartzberg would have had the power to set a new allocation had there been sufficient evidence on the record."

Appellants brought the present appeal. At oral argument, it was disclosed that the marina has been sold.

## DISCUSSION

◼ The first issue is whether the business judgment rule protects the Marina Allocation determined by the Board of the Homeowners Association. In *Levandusky v. One Fifth Avenue Apartment Corp.*, 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990), the New York Court of Appeals held that the business judgment rule informs the standard of review for the actions of cooperative and condominium governing boards. The business judgment rule, as developed in the commercial context, precludes judicial inquiry into the actions of corporate directors so long as those actions were taken in good faith and after a reasonable investigation. *See id.* 554 N.Y.S.2d at 811, 553 N.E.2d at 1321–22.

◼ It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply. *See, e.g., Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 483 N.Y.S.2d 667, 674–75, 473 N.E.2d 19, 26 (1984) (when merger creates inherent conflict of interest, burden to prove good faith and fairness of merger shifts to interested directors); *Lewis v. S.L. & E., Inc.*, 629 F.2d 764, 769 (2d Cir.1980). In commercial matters, moreover, if the business judgment rule does not protect a board's decision, then the burden falls upon the board to demonstrate that its actions were reasonable and/or fair. *See, e.g., Alpert v. 28 Williams St. Corp.*, 483 N.Y.S.2d at 674–75, 473 N.E.2d at 26.

The bankruptcy court apparently relied upon this body of law in determining that the business judgment rule did not apply and in applying a reasonableness test. *See Ludwig v. 25 Plaza Tenants Corp.*, 184 A.D.2d 623, 584 N.Y.S.2d 907, 908 (1992). We are less

certain that *Levandusky* adopts in wholesale fashion the rule that the protection of the business judgment rule is not available for decisions rendered by condominium board members who are not disinterested. *Levandusky* emphasized that the business judgment rule was to be looked to for purposes of analogy only and that the rule would have to be adapted in light of the somewhat different context of boards of not-for-profit cooperative condominiums. *Levandusky*, 554 N.Y.S.2d at 811–12, 553 N.E.2d at 1321–22. It is the case with regard to such boards that members will be condominium owners and will rarely be wholly disinterested. Arguably, therefore, one possible adaptation of the business judgment rule under *Levandusky* would be to discard the aspect of the rule that calls for independent judicial scrutiny of decisions by interested boards for reasonableness.

It can also be argued, however, that while the typical conflicts of interest that inhere in such boards will not be sufficient to deprive decisions of the business judgment rule's protection, some conflicts of interest may be so blatant and of such a magnitude that judicial scrutiny for reasonableness under *Levandusky* is called for. The conflict of interest in the instant matter is obvious and of great magnitude. The members of the board who voted for the Marina Allocation were all residential owners and were selected to represent the residential owners as a whole. Simple arithmetic demonstrates that the higher the Marina Allocation, the smaller the contribution by residential owners. If 71 residential units have been sold, the approximately $140,000 added to the Marina Allocation would thus save each residential owner up to $2,000 dollars annually.[1] Moreover, vesting the residential owners with complete power over the budget allocation left them without any incentive for self-restraint based on the need to have the cooperation of marina owners in resolving future budgetary matters where there was no conflict. However, we need not resolve the issue of the extent to which board decisions must be disinterested because the Marina Allocation fails both the reasonableness and good faith tests.

---

1. There may have been some overlap between residential and marina owners. However, in the case of overlap, the allocation would be irrelevant because the total payment of the individual owner would not be affected.

■ The Homeowners Association failed to carry the burden of showing reasonableness. First, the Marina Allocation included a number of line items representing expenses that either did not benefit or only tangentially benefited the marina slipowners. For example, the salary of the manager of the residences was a line item included in the Marina Allocation. Marina slipowners were thus to pay over half of that salary even though the manager has no duties relating to the marina. In addition, expenses relating to the pool were also a line item even though marina slipowners cannot use the pool. Second, a 53% allocation for the marina is facially unreasonable because the different wear and tear on property resulting from year-long residential use is significantly greater than seasonal riverbank use.

As noted, moreover, the business judgment rule does not protect actions taken in bad faith, *see, e.g., Alpert v. 28 Williams St. Corp.,* 483 N.Y.S.2d at 674–75, 473 N.E.2d at 26, and we believe that the Marina Allocation is so unreasonable that bad faith must be inferred. The inclusion of line items that neither concern nor substantially benefit the marina and the failure to take the seasonal nature of marina use into account cannot be reconciled with a good faith requirement. The record strongly indicates that the dominating consideration in fashioning the Marina Allocation was the residential owners' desire to lessen their own costs and that the incantations of the business judgment rule are driven by the lack of a legitimate rationale for the Allocation.

We turn now to the question of whether the bankruptcy court impermissibly substituted its own judgment regarding a proper allocation for that of the Homeowners Association Board. We cannot agree with the district court that the bankruptcy judge merely adopted a pre-existing allocation. Although the 14.25% portion of the earlier formula was retained, the bankruptcy court altered the line items to be considered. The bankruptcy court thus independently reviewed the line items and determined which were properly included and which were properly excluded. Appellants have provided us with nothing that undermines the reasonableness of the bankruptcy court's conclusions.[2] The only question, therefore, is whether the court had the power to impose an allocation or whether it had to defer to the Homeowners Association Board.

We believe the court acted properly. It had before it ample evidence that any determination by the Board would be highly suspect. Such a determination would not be entitled to deference but would be subject to the bankruptcy court's independent scrutiny. The court was highly unlikely to approve an allocation that was significantly different from the allocation it independently selected. However, returning the issue to the Board would itself delay matters, as would the inevitable legal processes concerning that determination. This delay in turn might adversely affect the debtor while the residential owners would not be significantly better off under any new allocation by the Board that would gain the court's approval.

■ The bankruptcy court's decision thus fell within its equitable powers. Bankruptcy courts have long had broad equity power to manage the affairs of debtors, *see Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), a power now codified in Section 105 of the Bankruptcy Code. *See* 11 U.S.C. § 105(a) ("The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). Given the circumstances described above, it was justifiable for the bankruptcy court to impose an allocation that it independently determined to be fair. *See In re Stirling Homex Corp.,* 591 F.2d 148, 155–56 (2d Cir.1978) (Bankruptcy court "may sift circumstances surrounding any claim in order to ascertain that injustice or unfairness is not accomplished in the administration of the debtor's estate, and in so

---

**2.** Appellants suggest that the bankruptcy court exhibited bias and excluded crucial evidence regarding previous calculations. However, as the district court noted, the so-called bias was merely an open expression of entirely justified skepticism. Moreover, the exclusion of the evidence in question was hardly reversible error. The bankruptcy court, as a trial court, has broad discretion regarding the admissibility of evidence and will be reversed only for abuse of that discretion. *See Sage Realty Corp. v. Insurance Co. of N. Am.,* 34 F.3d 124, 128 (2d Cir.1994). Given that the bankruptcy court based its ruling on direct evidence concerning which facilities benefited particular users of the complex, and how much they used them, we see no abuse of discretion.

doing it may adopt that remedy which it deems most appropriate under the circumstances.") (quoting 6 *Collier on Bankruptcy* ¶ 3.17, at 538 (14th ed. 1978)).

Finally, the bankruptcy court's order does not contain a time at which the allocation will expire or may be modified. We believe that the order was not intended to freeze the allocation for the rest of time, regardless of the termination of the bankruptcy proceeding, change of ownership of the marina, or alterations in other circumstances affecting the relationship of the marina to the project as a whole. We therefore believe that the order no longer bars any change in the budget allocation regarding the marina. We of course do not address the issue of the preclusive effect of the present decision on the future relationship of the marina and the Homeowners Association.

Affirmed in part, modified in part.

