**Liliane WILLENS & Steven Niederman, Appellants,**

v.

**2720 WISCONSIN AVENUE COOPERATIVE ASSOCIATION, INC., et al., Appellees.**

**No. 00–CV–1140.**

District of Columbia Court of Appeals.

Argued Oct. 11, 2001.

Decided March 11, 2004.

---

**16.** In light of our decision on limitations, we do not reach Judge Dixon's ruling on the merits.

Steven B. Gould for appellants.

Allan A. Noble for appellees.

Before TERRY, FARRELL and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

This dispute between a cooperative and two of its members, appellants Liliane Willens and Steven Niederman, was triggered by a decision of the cooperative's board of directors to forgive certain debts owed to the cooperative by other members. Willens and Niederman sued the cooperative and its directors for breach of contract and breach of fiduciary duty in connection with that decision. The trial court granted summary judgment to the defendants on each of appellants' claims. We reverse

## I.

The appellees in this case, defendants below, are 2720 Wisconsin Avenue Cooperative Association, Inc. (hereinafter referred to as the "Cooperative"), and six of its members who served without compensation on its Board of Directors.[1] Established under the Cooperative Association Act, D.C.Code § 29–901 et seq. (2001), the Cooperative is a non-profit housing corporation that owns and operates a forty-eight unit apartment building in the District of Columbia at 2720 Wisconsin Avenue, N.W. The Bylaws of the Cooperative provide that to each unit in the building there corresponds one membership interest in the Cooperative, as evidenced by a Mutual Ownership Contract.[2] The Bylaws specify the percentage of the total value of the Cooperative that each apartment unit represents, and each member of the Cooperative—i.e., the holder of each membership interest—is deemed "to own ... that [same] percentage of the Cooperative's overall equity." The Bylaws further state that the percentages are determinative of the members' "property rights ... in the equity of the Cooperative" and in any distributions of corporate reserves.[3] Thus,

---

1. The propriety of suing the directors individually is not before us in this appeal.

2. Each Mutual Ownership Contract "also evidence[s] title to the perpetual use and enjoyment of the particular dwelling unit to which it corresponds."

3. Article 3, Section 7 of the Bylaws states that "[e]ach member shall be deemed to own, subject to the terms of these Bylaws, that percentage of the Cooperative's overall equity arrived at by adding together the percentage figures set forth in Section 13 of this Article 3 for each apartment unit of which he is the owner." Section 13 in turn specifies a percentage for each apartment unit, e.g., 2.27565% for appellant Niederman's unit 302, that "shall be deemed to represent the percentage interest which each unit bears to the overall value of the Cooperative assets and shall be the percentage by which are determined the property rights of owners of membership interests in the equity of the Cooperative...." Article 5, Section 7 provides for the accumulation of a net saving reserve fund and specifies that "[u]pon dissolution, or earlier if deemed advisable by the Board, such reserves may be returned to the members on the basis

members of the Cooperative do not own the apartment units themselves; rather, the members own shares in the corporation represented by their units. At the time of the events at issue here, appellant Willens owned a 6.43381% share of the Cooperative as represented by three units. Appellant Niederman owned a 2.27565% share represented by one unit.

The Cooperative was established and incorporated in 1974 by its developer, who had acquired the building at 2720 Wisconsin Avenue subject to three mortgages totaling $675,000. The developer in turn transferred the building to the Cooperative in exchange for a fourth, "wrap-around" or "blanket" mortgage, which encompassed the payment obligations under the first three mortgages plus an additional $270,000 for the developer, and a promissory note from the Cooperative in the total amount of $945,000. This so-called "Wrap Note" accrued interest at 8% per annum and was amortized over thirty years with a final payment due in 2004.

The Wrap Note was a debt of the Cooperative. The Mutual Ownership Contracts apportioned this corporate debt among the Cooperative's members. When a member purchased his or her unit and corresponding interest in the Cooperative, the Mutual Ownership Contract required the member to execute a promissory note in favor of the Cooperative for the balance due on the unit's proportionate share of the Wrap Note debt (unless the member chose to pay the full amount in a lump sum at settlement). Like the Wrap Note, the individual promissory notes bore interest at 8% per annum and fully matured in 2004. Payments on the notes were due monthly, but prepayment was permitted without penalty.[4]

Appellants Willens and Niederman were two of only four members of the Cooperative who exercised their right to prepay their shares of the Wrap Note obligation. (The other two are not parties to this litigation.) After having purchased two apartment units and signed standard 8% promissory notes to the Cooperative for each, Willens elected to pay off both her notes in 1993, eleven years before the notes otherwise would have matured. That same year Niederman likewise paid off the promissory note he had signed for his unit. Four years later, in August 1997, Willens paid the full purchase price at settlement for a third unit, which obviated the need for her to sign any promissory note in that transaction. The parties have treated this as equivalent to a prepayment for purposes of the present litigation.

Meanwhile, in the mid–1990's, the Cooperative entered into negotiations to retire its corporate obligations under the Wrap Note. By this time, the developer reportedly was bankrupt and the Wrap Note was in the hands of a bankruptcy trustee. The Cooperative claimed in the negotiations that it was entitled to numerous set-offs on account of judgments it had obtained against the developer, payments it had been compelled to make on behalf of the developer to the holders of the mortgages underlying the Wrap Note, and various other losses it had incurred through the fault of the developer. As some of these set-off claims raised complex accounting issues or were otherwise unresolved, the actual net amount that the Cooperative owed on the Wrap Note was in dispute.

of the percentage figures set forth in Section 13 of Article 3 of these Bylaws."

4. Although appellants dispute the point, appellees assert that the Cooperative was disadvantaged when members prepaid their notes because then it no longer collected interest on their obligations but still had to pay out 8% interest on the Wrap Note.

Ultimately, though, on December 31, 1996, the Cooperative and the bankruptcy trustee reached a compromise under which the Cooperative paid $285,000 in cash and assumed the developer's liability of $32,000 on an underlying note, and the Wrap Note was cancelled. To make its payment, the Cooperative drew in part on note payments by its members that it had previously set aside for the developer and in part on its reserves. Based on a straight amortization schedule, the principal balance of the Wrap Note as of the end of 1996 was $499,000, but given the uncertainty over the true value of the Cooperative's set-offs, none of the parties to this appeal is able to state whether the Cooperative saved money or overpaid by retiring the Wrap Note on the terms that it did. In connection with the summary judgment motions in the trial court, however, the parties stipulated that the Cooperative "paid in full its obligation under the Wrap Note," and "may have even overpaid its obligations, having not received the benefit of all of the set-offs" to which it was entitled. Nevertheless, in view of the unsettled state of affairs, appellants agree that the settlement was in the Cooperative's best interest.

The disagreements were over what came next. After retiring the Wrap Note, the Cooperative's Board of Directors undertook to determine the consequences of the settlement for the members of the Cooperative, who had signed promissory notes for amounts that had been tied to the original Wrap Note debt. There were essentially two groups of members to consider: those many who were still paying off their promissory notes and those few who had prepaid their notes (or who, equivalently, had paid the purchase price for their memberships in full without providing a note).[5] On the one hand, the Cooperative was still holding the individual promissory notes of the large majority of its members, including all but one (appellant Willens) of its Board of Directors. These notes covered 42 out of the 48 units in the apartment building. The monthly payments on these notes were scheduled to continue for another eight years, until 2004. On the other hand, there were the four members previously mentioned, holding a total of six apartment units, who had paid their obligations to the Cooperative in full prior to the settlement with the bankruptcy trustee. After extensive consultations with outside counsel, the Board of Directors decided (over director Willens's objection) to treat the two groups of members differently.

In accordance with its counsel's recommendation, the Board decided to terminate the note payment obligations of the majority of members who had not paid in full their proportionate share of the Wrap Note and whose promissory notes were still outstanding. The Board made this decision on the premise, as expressed by its counsel, that since the amount of each promissory note was fixed originally by reference to the amount of the Wrap Note, "upon the reduction of the blanket mortgage balance as a result of the Settlement the amount of blanket mortgage allocated to each such unit was reduced."[6] In order

---

**5.** The first group was composed of two sub-classes, but we need not be concerned with the distinction between them here.

**6.** In view of its significance in our analysis below, we pause to observe that this rationale for terminating the outstanding promissory notes early is obscure in two respects. First,

the assumption that the Wrap Note debt was "reduced" in the settlement is dubious, as the Board's counsel himself recognized and consistently reported to the Board. Indeed, as previously mentioned, the parties agreed at the summary judgment stage that the Cooperative paid its obligation "in full" (and perhaps even overpaid). If the Cooperative used valid

to replenish the corporate reserves that had been depleted to retire the Wrap Note, however, the Board imposed a special monthly assessment on the members in the majority group through April 1998 in the same amounts as their monthly note payments had been. The net effect of this decision was to forgive the last six-and-a-half years' worth of note payments, due from May 1998 to December 2004, that these members of the Cooperative otherwise would have owed.

There were no debts to forgive, however, in the case of the members in the minority group who had prepaid their promissory notes before the Wrap Note was retired. The Board of Directors deliberated at length over whether the Cooperative should pay a rebate to those members on the theory that they had overpaid. The Board's outside counsel initially advised in September 1997 that there was "no 'correct' way to assess this situation." On the one hand, he acknowledged, it could be argued that the members who had prepaid their full portion of the corporate obligation had the same right as every other member to share in the "discount"[7] the corporation had negotiated. But on the other hand, it could be argued that members who paid "not to share in the burdens of the mortgage ... should not share in the benefits."[8] The Board's counsel thought that "each theory has its

merits." Ultimately, however, he advised the Board that "legally, there is no support for making any adjustment" that would involve disbursing corporate funds to the members who had prepaid their share of the Wrap Note:

> The owners who paid off their notes had their notes canceled and their obligation to the Cooperative under those notes terminated. There existed no agreements between those owners and the Cooperative to make an adjustment on the payoff transaction in the event that the amount that the Cooperative subsequently paid the Developer was more, or less, than the proportionate amount paid by these prepaying owners.

In counsel's opinion, moreover, the Cooperative's various set-offs against its obligation to the developer did not pass through to the Cooperative's members: "The obligation of the unit owner was to pay his or her promissory notes reflecting his or her share of the blanket mortgage and there were no set-offs allowed." The Board's counsel also advised that there did not appear to be "any equitable basis" either for making an adjustment on behalf of the pre-paying members of the Cooperative. By pre-paying when they did, counsel explained, these members limited their exposure to possible additional charges at-

set-offs to lower the balance due, that arguably was just payment in another form; the set-offs presumably were corporate assets equivalent (in this context) to cash.

Second, even if the Cooperative's Wrap Note debt was "reduced," it is by no means clear that members with outstanding promissory notes were *entitled* to receive a concomitant reduction of *their* obligations to the Cooperative. While the face amount of each member's note was proportionate to the face amount of the Wrap Note, the obligations were, at least arguably, independent. The Mutual Ownership Contracts and the individual promissory notes contain no provision

explicitly entitling Cooperative members to adjustments of their debt to reflect changes in the Cooperative's debt.

7. Assuming *arguendo* that there was a "discount;" see footnote 6, *supra*.

8. "Proponents of this view," counsel explained, "would argue that if a late fee were assessed on the wrap mortgage or if there were costs attendant to refinancing that mortgage those who had paid off their share of the mortgage would not want to participate in those additional mortgage related costs, and justifiably so."

tributable to the Wrap Mortgage in the future; conversely, each prepayment actually "placed the Cooperative at a disadvantage" because the Cooperative "lost the difference" between the 8% interest it still had to pay under the Wrap Note and the lower money market rate of return it earned on the prepaid funds.

In the end, consistent with the views of its counsel,[9] the Board of Directors voted not to use funds belonging to the Cooperative to pay a reimbursement to the members who had prepaid their promissory notes. Director Willens cast the only dissenting vote. Simultaneously, the Board excused the pre-payers from the temporary special assessments it imposed on other members of the Cooperative to replenish corporate reserves that had been depleted to retire the Wrap Note. This was appropriate, its counsel advised, because that depletion "should be viewed as a borrowing of those reserves by those in the Cooperative who still had an obligation on the blanket mortgage."

Appellants sued the Cooperative and the majority of its Board of Directors in Superior Court for breach of contract and breach of fiduciary duty. Their complaint sought compensatory damages of $19,657 for Willens and $17,862 for Niederman. These amounts were, allegedly, what appellants would have saved had they not prepaid their promissory notes and instead been treated the same as the majority of the Cooperative's members.

Both sides eventually moved for summary judgment. The court denied appellants' motion and awarded summary judgment to the Cooperative and the defendant directors. The court ruled that the fiduciary duty claim was foreclosed by the

"business judgment rule," under which "courts should review business decisions of a corporation only for fraud, bad faith, self-dealing, unconscionable conduct, gross overreaching, or abuse of discretion." On the undisputed facts, the court said, "there is simply no evidence from which a jury could conclude" that the Board of Directors engaged in such misconduct. Rather, "[i]t appears from the undisputed facts that the Board deliberately and carefully considered numerous options and determined what was best for the Cooperative as a whole and the members as a group. This is precisely the kind of circumstance in which the business judgment rule applies to preclude plaintiffs' claims."

The court also ruled that the plaintiffs could not prove breach of contract. The court found no provision in the plaintiffs' Mutual Ownership Contracts "for ensuring that members maintain for the life of the corporate mortgage their respective obligations regardless of" prepayment or other events. Rather, "each Co-op member was contractually free to make the best business decision available to him or her, including a decision to prepay a mortgage and in one instance, to pay in cash at settlement." Nor did the court perceive that the directors had done anything to destroy or injure the plaintiffs' rights to benefit under their contracts and thereby breached the implied contractual duty of good faith and fair dealing. Here the court found two factors dispositive. First, the court said, the plaintiffs had not shown that members of the Cooperative in the majority group benefitted from the extinguishment of their promissory notes, because those members were obliged to make the same payments to replenish the Cooperative's reserves.[10] Second, the

9. Appellants dispute whether and to what extent the Board of Directors in fact relied on its counsel's advice. Nothing in this appeal turns on the precise answer to that question.

10. As the court elaborated:

court stated, the plaintiffs also had not shown that "the benefit that they received in reduced total interest payments that accrued when they prepaid their mortgages was less than the amount the Cooperative forgave on the outstanding loans of the members who had not prepaid."

In a motion to alter or amend the judgment, appellants pointed out that the majority group members did benefit, in that the special assessment imposed on them to replenish the Cooperative's reserves lasted only through April 1998 and therefore was less than what they would have paid had their promissory notes not been cancelled. The court issued an order in which it acknowledged this "clarification" but adhered nonetheless to its decision to enter summary judgment for the defendants "for the reasons previously stated."

## II.

■ Our appellate review of an order granting summary judgment is *de novo*— we conduct an independent review of the record to determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c). *See, e.g., Joeckel v. Disabled American Veterans*, 793 A.2d 1279, 1281 (D.C.2002). We must view the evidence in the light most favorable to the non-moving party, with the understanding that "some metaphysical doubt as to the material facts" is not enough to defeat the motion. *Matsushita Electric Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Our examination of the existing record in this case persuades us that it should not have been resolved at the summary judgment stage. So far as now appears, a jury could find that the Board of Directors of the Cooperative, though acting in good faith and on advice of outside counsel, violated the contractual rights of minority shareholders and breached a fiduciary duty of loyalty by discriminating against them in the distribution of a corporate asset.

### A. Cancellation of Debts as the Disproportionate Distribution of Corporate Assets

■ Our analysis turns on the question of how to characterize the Board's decision to cancel the debts owed to the Cooperative by the shareholder members whose promissory notes were still outstanding. Those promissory notes evidenced the members' contractual obligations to make payments to the Cooperative—not, it must be emphasized, to the developer. So far as we can tell on the current record, the members' contractual obligations were neither contingent upon the continuing existence of the Wrap Note nor reduced by the set-offs that the Cooperative had against the developer. The members' individual promissory notes evidently were, therefore, assets of the Cooperative. The value of those assets to the Cooperative in 1997 was, it would seem, readily ascertainable—it was simply the suitably discounted sum of the projected future income stream

Plaintiffs argue that the directors were obliged as fiduciaries to continue to collect the mortgage payments from the other unit owners even after the corporate debt was extinguished. Essentially, it appears, the directors did precisely that by continuing to collect the same total sums as previously, by assigning the payments to the corporate reserves. By not requiring plaintiffs to make these contributions, the directors provided the equivalent benefit to plaintiffs that they seek under a different title.

under the notes to the end of 2004.[11]

It follows that the cancellation of the outstanding promissory notes was conceptually equivalent to the distribution of corporate assets—the uncollected future payments on the notes—to shareholders of the corporation. Significantly, it was a disproportionate distribution. Although every shareholder member had a proportionate ownership interest in the assets of the Cooperative, these particular assets were distributed to some members but not to others. Specifically, the minority of members who had already paid off their own promissory notes in full did not receive their proportionate share of the corporate assets being distributed; they received nothing, in fact. Meanwhile, the majority of members whose debts were still outstanding (including the members who served on the Board of Directors other than Willens) received more than their proportionate share of the distribution; collectively, they received all of it, in fact.

This disparity in treatment was lessened by the temporary special assessment imposed on the majority to replenish corporate reserves. Lessened, but not eliminated, for the debt forgiven exceeded the assessment by over six years' worth of note payments.

It may be true that the few members who relieved themselves of several years' worth of interest payments by prepaying the principal balances of their promissory notes thereby received a benefit that the other members did not receive, but that is beside the point. All members had the same contractual right to prepay without penalty. The majority of members who did not exercise that right therefore had no property interest in the benefits obtained by the minority who did. Rather, the majority's property interest (an indirect one) was solely in the funds that the Cooperative received from the minority. In contrast, the minority did have an indirect property interest in the unpaid promissory notes of the majority, since those notes were corporate assets. This indirect property interest was not reduced merely because the minority had prepaid their own notes. Thus there is no "setting off" of the benefits that the minority of members had received from prepaying against the benefits that the majority of members received from the cancellation of their debts.

Our understanding that a jury reasonably could view the cancellation of shareholder debt as equivalent to a disproportionate distribution of corporate assets underpins our assessment of appellants' claims of breach of contract and breach of fiduciary duty. As the shareholders' rights in question are at bottom contractual in nature, the claims overlap. *Cf. Williams v. The 5300 Columbia Pike Corp.*, 891 F.Supp. 1169, 1182 n. 26 (E.D.Va.1995). We turn first to the breach of contract claim.

---

11. We would take a different view of the matter if it turns out that the members were legally entitled to a reduction or cancellation of their payment obligations on account of the retirement of the Wrap Note. In that case the corporate asset we perceive in the members' promissory notes would diminish or evaporate. But as previously discussed in footnote 6, *supra*, we have found no such entitlement in our scrutiny of the notes and the Mutual Ownership Contracts.

To be fair, the parties have yet to weigh in fully on this issue (though they have alluded to it). Nor did the trial court squarely resolve the question of the members' legal entitlement to a reduction of their debts to the Cooperative in its summary judgment ruling. We therefore are not prepared to treat the question as concluded or resolve it ourselves. The parties are free to explore it on remand.

## B.  Breach of Contract

Appellants contend that the Board of Directors violated their contractual rights as members of the Cooperative, including the implied covenant of good faith and fair dealing, when it terminated the existing promissory note obligations of a majority of members without bestowing an equal benefit on those members who had prepaid their notes.  We agree that appellants made a prima facie showing of breach of contract sufficient to withstand appellees' motion for summary judgment.

■■■ "The cooperative instruments, *which include the bylaws* ..., constitute a contract governing the legal relationship between the cooperative association and the unit owners." *Burgess v. Pelkey*, 738 A.2d 783, 787 (D.C.1999) (emphasis supplied).  As a "form of private law making," the instruments "must be construed as a whole," and "strictly ... as they are written, giving the language its clear, simple, and unambiguous meaning." *Johnson v. Fairfax Village Condo. IV Unit Owners Ass'n*, 548 A.2d 87, 91 (D.C.1988) (internal quotation marks and citation omitted).  Additionally, as " 'in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." ' *Hais v. Smith*, 547 A.2d 986, 987 (D.C.1988) (quoting *Uproar v. Nat'l Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir.1936)).

The relevant Cooperative instruments—the Bylaws, appellants' Mutual Ownership Contracts, and their promissory notes—do not contain language explicitly entitling members who prepaid their notes to a refund.  But the Bylaws do explicitly state that each member, including appellants, "owns" (and has "property rights" in) a fixed and specified percentage of the Cooperative's "overall equity."  See footnote 3, *supra*.  The owners' equity in a corporation is simply their aggregate financial interest in its assets;  more specifically,

> "Owner's equity is the residual claim of the owners of the business on its assets after recognition of the liabilities of the business.  Owner's equity represents the amounts contributed by the owners to the business, plus the accumulated income of the business since its formation, less any amounts that have been distributed to the owners."  Charles H. Meyer, *Accounting and Finance for Lawyers in a Nutshell* 4 (1995).

BLACK'S LAW DICTIONARY 1131 (7th ed.1999).

As the Bylaws explicitly state with regard to distributions from the Cooperative's reserves, a distribution of assets must be in proportion to each member's designated share of the Cooperative's total equity.  A disproportionate distribution is prohibited because it would violate the members' property rights as specified in the Bylaws.[12]

It appears that the Board of Directors overlooked this prohibition when it decided to cancel the outstanding promissory notes.  Viewing that cancellation as equiv-

---

12.  To illustrate: suppose that the Cooperative's total equity amounted to $250,000.  A 5% shareholder then had an interest worth $12,500.  If the Cooperative distributed $50,000, reducing its total equity to $200,000, the interest of the 5% shareholder in the Cooperative declined to $10,000.  The share-holder would have been entitled to receive the difference, $2,500, in the distribution.  If instead the 5% shareholder received nothing in the distribution, he was treated as though he originally owned only 4% of the Cooperative's equity.

alent to a distribution of corporate assets, we see that the Bylaws entitled appellants to receive a proportionate share of it. Since appellants received nothing, appellants have made a prima facie case that their contractual rights were violated.

### C. Breach of Fiduciary Duty

Appellants contend that the directors also breached their fiduciary duty to act fairly toward all the members of the Cooperative. Again, we think that appellants made a prima facie case sufficient to defeat the summary judgment motion.

■■■ The directors of the Cooperative owed the duties of a fiduciary to the corporation and to its members. *See Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n,* 441 A.2d 956, 962–63 (D.C. 1982). Among those duties is the duty of loyalty. *See generally* FLETCHER CYC. CORP. § 837.60 (perm.ed., rev.vol.2002). "[T]he board owes its duty of loyalty to the cooperative—that is, it must act for the benefit of the residents collectively." *Levandusky v. One Fifth Ave. Apartment Corp.,* 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317, 1322 (1990). "The directors of a cooperative owe a fiduciary duty to act solely in the best interest of *all* shareholders." *Ackerman v. 305 East 40th Owners Corp.,* 189 A.D.2d 665, 592 N.Y.S.2d 365, 367 (1993) (emphasis added). As fiduciaries, directors "cannot, either directly or indirectly, ... in any ... transaction in which they are under a duty to guard the interests of the corporation, make any profit, or acquire any other personal benefit or advantage, *not also enjoyed by the other shareholders.*" FLETCHER CYC. CORP. § 884, p. 348

(emphasis supplied).[13] Thus the "unequal treatment of shareholders" may violate the fiduciary duty of loyalty—especially if the directors responsible for such treatment are personally interested in the transaction in question. *Ackerman, supra; see also Kelley v. Broadmoor Coop. Apartments,* 676 A.2d 453, 460 (D.C.1996) ("We have previously recognized that a regulation may be unreasonable if it has 'an unfair or disproportionate impact on only certain unit owners.'") (quoting *Johnson v. Hobson,* 505 A.2d 1313, 1318 (D.C.1986)); *accord, Burgess,* 738 A.2d at 790.

■■■ As a general proposition, "[w]hether a director or officer has properly discharged his or her duty of loyalty is a question of fact to be determined in each case in view of all the circumstances." FLETCHER CYC. CORP. § 837.60, p. 186. Here, appellants made a prima facie showing that the defendant directors distributed corporate assets unequally and disproportionately among the Cooperative's owner-members of the Cooperative. The distribution favored a majority that included the directors themselves over the minority of members that included appellants. This unrefuted showing was sufficient to survive summary judgment on appellants' breach of fiduciary duty claim and, in point of fact, to shift the burden to the directors to prove that they fulfilled their fiduciary duties. *See Lewis v. Jordan Inv., Inc.,* 725 A.2d 495, 500 (D.C. 1999). Appellants were not required to present evidence that the directors were motivated by a desire for personal gain or otherwise acted in bad faith. "Even when directors act in good faith, their conduct

---

**13.** "The duty of loyalty in essence involves conflicting economic or other similar interests. ... The duty of loyalty is transgressed when a corporate fiduciary, whether director or officer, uses his or her corporate office to promote, advance or effectuate a transaction between the corporation and such person, and that transaction is not substantively fair to the corporation" or, it may be added, its shareholders. FLETCHER CYC. CORP. § 837.60 at p. 184 (footnotes omitted).

may unintentionally violate the duty of loyalty." FLETCHER CYC. CORP. § 837.60, p. 185.

Appellees sought summary judgment, and the trial court granted it, on the ground that appellants' breach of fiduciary duty claim was precluded by the so-called "business judgment rule." This reliance was misplaced, however.

In its classic formulation, the business judgment rule

> is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.... [Citations omitted.] Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984). In practical terms, the business judgment rule means that "directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner,* 746 A.2d 244, 264 n. 66 (Del.2000). *See also Levandusky,* 554 N.Y.S.2d 807, 553 N.E.2d at 1321–22 (adopting the business judgment rule as a guide for reviewing actions by directors of cooperatives, and stating that "[s]o long as the board acts for the purposes of the cooperative, within the scope of its authority and in good faith,

courts will not substitute their judgment for the board's").

As it happens, our court has yet to embrace the business judgment rule as a component of this jurisdiction's common law. We specifically "decline[d] to adopt" the business judgment rule in *Johnson,* 505 A.2d at 1317 n. 7, opting instead to review (and uphold) regulations promulgated by a condominium association under a less deferential "reasonableness" standard.[14] *Johnson* did not necessarily foreclose approval of the business judgment rule in the future, but in this case we do not reach that question for another reason.

■ That reason is this: "[g]enerally, the business judgment rule will not apply where there is a breach of the duty of loyalty. Thus, the duty of loyalty must be satisfied before the business judgment rule is applicable to actions of corporate fiduciaries." FLETCHER CYC. CORP. § 837.60, p. 185; *see, e.g., Schultz v. 400 Coop. Corp.,* 292 A.D.2d 16, 736 N.Y.S.2d 9, 14 (2002) (noting that "unequal treatment of shareholders is sufficient to overcome the directors' insulation from liability under the business judgment rule") (internal quotation marks and citation omitted). As the Supreme Court of Delaware has explained, the protections of the business judgment rule "can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment." *Aronson,* 473 A.2d at 812.

> From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.... [Citations omitted.] Thus, if such director interest is present,

---

**14.** We have adhered to the business judgment rule when required to do so in the application of foreign law. *See Kelley,* 676 A.2d at 459 (applying Delaware law).

and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever....
*Id.* "It is," in short, "black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply." *Croton River Club v. Half Moon Bay Homeowners Ass'n,* 52 F.3d 41, 44 (2nd Cir.1995); *see also Williams,* 891 F.Supp. at 1183–84.

We appreciate that the directors of a residential cooperative (or condominium) association will typically be unit owners who "will rarely be wholly disinterested" in any decision the board may make. *Croton River Club, supra.* This may be reason enough to stick with the "reasonableness" standard of review employed in *Johnson,* or otherwise to be cautious in affording such directors the protections of the business judgment rule; alternatively, it may be a justification for applying the rule with a degree of tolerance for some director interestedness where cooperative and condominium boards of directors are involved.

 Wherever the line should be drawn, however, we think the present case falls on the wrong side of it for purposes of deciding whether the business judgment rule applies. Without in any way impugning the good faith and integrity of the director defendants in this case, the fact remains that they had a personal economic interest in the decision they made that was in direct conflict with that of appellants and other Cooperative members in the minority. The interest and the conflict, taken together, are too blatant in our view for the business judgment rule to shield it from scrutiny. It is not only that the directors benefitted personally from their decision to cancel their own (and the majority of members') sizable promissory note obligations; it is also that they benefitted personally and disproportionately, if

indirectly and only modestly, from their concurrent decision to withhold corresponding payments from the minority of members, including appellants, who had prepaid their notes. Simply put, withholding the distribution of corporate assets (money) from the minority indirectly enriched the majority, if only because the money remained in the corporate treasury.

Our conclusion that the majority directors were interested parties does not mean that the challenged board decisions were unreasonable or otherwise improper; it merely means that summary judgment should not have been granted against appellants on the basis that the business judgment rule shielded those decisions from judicial scrutiny. On remand both sides may continue to develop the record and their arguments regarding whether the directors adhered to their fiduciary obligations.

### III.

For the foregoing reasons, we reverse the award of summary judgment and remand the case for further proceedings.